**MARYLAND COAL AND COKE COMPANY**

v.

**Edgar A. McGINNES, District Director of Internal Revenue.**

Civ. A. No. 26286.

United States District Court
E. D. Pennsylvania.

Jan. 21, 1964.

S. Gordon Elkins, David P. Brown, Jr., Stradley, Ronon, Stevens & Young, Philadelphia, Pa., for plaintiff.

Drew J. T. O'Keefe, U. S. Atty., Philadelphia, Pa, Louis F. Oberdorfer, Asst. Atty. Gen., C. Moxley Featherston, Rufus

E. Stetson, Jr., John M. Hammerman, Dept. of Justice, Washington, D. C., for defendant.

LUONGO, District Judge.

Maryland Coal and Coke Company (Maryland) instituted suit for the recovery of sums paid the defendant in 1954 for federal income and excess profits tax deficiencies assessed for the 1950 calendar year. The deficiencies resulted from defendant's determination that a $200,000 payment received by Maryland in 1950 for cancellation of an exclusive sales agency contract was taxable as ordinary income rather than as a capital gain. Defendant has moved for summary judgment. The facts are not in dispute, many having been stipulated and others, submitted by Maryland by affidavit, have been conceded by defendant for the purpose of the determination of his motion.

## THE FACTUAL SITUATION

The relevant stipulated facts are as follows:

Maryland Century Coal Company (Century) acquired an assignment of lease to certain coal lands in January, 1945. On January 27, 1945, Century entered into an agreement under which it appointed Maryland exclusive sales agent for the sale and distribution of all coal produced from the Century mine. Maryland agreed to use its best efforts to promote the sale of the coal at the best prices obtainable. Maryland's compensation was a commission based upon profits, but not to exceed 15 cents a ton and was to remain unchanged until a guarantee by a Maryland subsidiary (Maryland New River Coal Company) of the expenditure of certain funds for capital improvements of the Century mine had expired.

Maryland guaranteed payment of all accounts, reserving, however, the right to reject any order where the credit risk, in its opinion, was unsatisfactory. Maryland undertook to render billings in its own name and to remit the proceeds, after deducting its commissions, to Century. The agreement was to remain in effect for at least two years, with provision for cancellation, upon notice, upon termination of the guarantee.

On November 15, 1946, the terms of the guarantee having been complied with, the agreement between Century and Maryland was revised as to compensation (commission to be at the fixed rate of 15 cents a ton) and duration (to be "for the life of the Century mine"), otherwise the terms remained the same as those in the 1945 agreement.

In the course of Maryland's exclusive sales agency, a corporation trading as "Subsidiary Companies of Bethlehem Steel Corporation" (Bethlehem) became the purchaser of substantial quantities of coal produced by Century and in 1950, Bethlehem sought to obtain the sole and unrestricted use of the coal in the mine and, to that end, offered to purchase the Century stock. Its offers, in successively higher amounts, were all conditioned upon termination of the Maryland agreement. On December 29, 1950, Bethlehem purchased the Century stock, paying $1,300,000 to Century's stockholders and, by check dated December 30, 1950, $200,000 to Maryland in settlement of the sales agency agreement. On the day of the purchase of the Century stock, in a writing which recited no money consideration, the sales agency agreement between Maryland and Century was terminated.

Maryland's affidavit sets forth these additional facts and circumstances:

In 1945 the lease of the Century coal lands was offered to Maryland provided it would make available $100,000 for capital expenditures to modernize the coal operation. Century was organized for the purpose of acquiring the lease and Maryland committed its subsidiary, Maryland New River Coal Company, to lend to Century and to guarantee the expenditure by Century of $100,000 to improve the Century mine. The subsidiary did lend Century $98,000 and was reimbursed that amount by Maryland. The

funds were used to improve the operation of the mine to bring the price of coal down to competitive levels to create sales at a volume profitable to Maryland as exclusive sales agent. That loan was repaid prior to the time the revised agreement between Maryland and Century was entered into in November, 1946. Maryland made further loans to Century for operating capital from 1946 to 1950, which loans were also repaid. In 1950 when Bethlehem sought to purchase the Century stock its first offer was $1,000,-000. Successively higher offers were made thereafter and when the bid reached $1,300,000 it was satisfactory to all of Century's stockholders except Medford J. Brown, Maryland's president and one of Century's principal stockholders. Brown's refusal to go along with that offer resulted in Bethlehem's increasing it to $1,500,000. Brown agreed to accept that offer provided something was paid to Maryland for its rights under the contract. An additional amount was sought from Bethlehem for the termination of Maryland's contract rights but Bethlehem refused, insisting that its offer was conditioned upon termination of the Maryland contract. Brown then sought and obtained agreement from the other Century stockholders (Brown and two others were substantial stockholders in Century as well as stockholders and employees of Maryland) that the $200,000 increase in the offer which had been brought about by his refusal to go along with the lesser one, be paid to Maryland to compensate it for the loss of its rights under the exclusive sales agency agreement. No other standard or measure for determining the amount to be paid for Maryland's contract was ever discussed.

## THE ISSUE

The issue here is a narrow one, whether the lump sum paid for the termination of the exclusive sales agency contract was ordinary income, as defendant treated it, or a long-term capital gain, as plaintiff reported it in its 1950 return.

## DISCUSSION OF APPLICABLE LEGAL PRINCIPLES

■ Long-term capital gain is limited to gain "from the sale or exchange of a capital asset * * *." Internal Revenue Code of 1939, Section 117(a) (4). Although the Code defines "capital asset" in broad terms—"property held by the taxpayer" [Section 117(a) (1)]—it

" * * * is to be construed narrowly in accordance with the purpose of Congress to afford capital-gains treatment only in situations typically involving the realization of appreciation in value accrued over a substantial period of time, and thus to ameliorate the hardship of taxation of the entire gain in one year. * * *" Comm'r v. Gillette Motor Transport, Inc., 364 U.S. 130, 134, 80 S.Ct. 1497, 4 L.Ed.2d 1617 (1960). See also: Corn Products Co. v. Comm'r, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29 (1955), rehearing denied, 350 U.S. 943, 76 S.Ct. 297, 100 L.Ed. 823 (1956); Heebner v. Comm'r, 280 F.2d 228 (3rd Cir. 1960), cert. denied, 364 U.S. 921, 81 S.Ct. 285, 5 L.Ed.2d 260 (1960).

■■ Basically, Maryland's contract with Century gave it the right to perform services and receive compensation. The overwhelming weight of authority is that contracts for the performance of services are not capital assets and the proceeds from their transfer or termination will not be accorded capital gains treatment. United States v. Eidson, 310 F.2d 111 (5th Cir. 1962), rehearing, 312 F.2d 744 (1963); Holt v. Comm'r, 303 F.2d 687 (9th Cir. 1962); Gordon v. Comm'r, 262 F.2d 413 (5th Cir. 1958); Comm'r v. Pittston Co., 252 F.2d 344 (2nd Cir. 1958), cert. denied, 357 U.S. 919, 78 S.Ct. 1360, 2 L.Ed.2d 1364 (1958); Roscoe v. Comm'r, 215 F.2d 478 (5th Cir. 1954); General Artists Corp. v. Comm'r, 205 F.2d 360 (2nd Cir. 1953), cert. denied, 346 U.S. 866, 74 S.Ct. 105, 98 L.Ed. 376 (1953); Comm'r v. Starr Bros., Inc., 204 F.2d 673 (2nd Cir. 1953);

Paul Small Artists, Ltd., 37 T.C. 223 (1961).[1]

The authority to the contrary, Jones v. Corbyn, 186 F.2d 450 (10th Cir. 1950), Sammons v. Dunlap, CCH 52–2 U.S.T.C. ¶ 9481 (N.D.Tex.1952), Rev.Rul. 55–374, 1955–1 Cum.Bull. 370, is not convincing. The Corbyn decision was discredited in Wiseman v. Halliburton Oil Well Cementing Co., 301 F.2d 654 (10th Cir. 1962); Sammons v. Dunlap, decided within the jurisdiction of the Court of Appeals for the Fifth Circuit, is subject to that Court's subsequent decision in Roscoe v. Comm'r, supra; and the Revenue Ruling referred to above was handed down prior to the Supreme Court's decisions in Comm'r v. Gillette Motor Transport, Inc., supra, and Corn Products Co. v. Comm'r, supra.

Maryland seeks to align itself with those cases according taxpayers capital gains treatment. In addition to the Corbyn and Sammons cases mentioned above, these are: United States v. Dresser, Ind., Inc., 324 F.2d 56 (5th Cir. 1963); Bisbee-Baldwin Corp. v. Tomlinson, 320 F.2d 929 (5th Cir. 1963); Comm'r v. Killian, 314 F.2d 852 (5th Cir. 1963); Nelson Weaver Realty Co. v. Comm'r, 307 F.2d 897 (5th Cir. 1962); Comm'r v. Ferrer, 304 F.2d 125 (2nd Cir. 1962); Metropolitan Bldg. Co. v. Comm'r, 282 F.2d 592 (9th Cir. 1960); Comm'r v. Goff, 212 F.2d 875 (3rd Cir. 1954), cert. denied, 348 U.S. 829, 75 S.Ct. 52, 99 L.Ed. 654 (1954); Comm'r v. McCue Bros. & Drummond, Inc., 210 F.2d 752 (2nd Cir. 1954), cert. denied, 348 U.S. 829, 75 S.Ct. 53, 99 L.Ed. 654 (1954); Comm'r v. Ray, 210 F.2d 390 (5th Cir. 1954), cert. denied, 348 U.S. 829, 75 S.Ct. 53, 99 L.Ed. 654 (1954); Comm'r v. Golonsky, 200 F.2d 72 (3rd Cir. 1952), cert. denied, 345 U.S. 939, 73 S.Ct. 830, 97 L.Ed. 1366 (1953); Elliott B. Smoak,

43 B.T.A. 907 (1941). An analysis of these cases reveals that in each instance taxpayer had more than merely a contractual opportunity "to obtain periodic receipts of income, by dealing with another * * *, or by rendering services * * *." Comm'r v. Ferrer, supra, 304 F.2d at 130–131. In United States v. Dresser Ind., Inc., supra, taxpayer had an interest in a patent; in Bisbee-Baldwin Corp. v. Tomlinson, supra, Comm'r v. Killian, supra, Nelson Weaver Realty Co. v. Comm'r, supra, and Elliott B. Smoak, supra, the interest was in files, customer lists, and goodwill; Comm'r v. Ferrer, supra, in a copyrighted play; Metropolitan Bldg. Co. v. Comm'r, supra, Comm'r v. McCue Bros. & Drummond, Inc., supra, Comm'r v. Golonsky, supra, in a leasehold; Comm'r v. Goff, supra, in the output of machines; Comm'r v. Ray, supra, in a restrictive servitude.

█ As Judge Friendly observed in the Ferrer case, the common thread running through those cases seems to be the existence of an enforceable estate, encumbrance or interest in an object or thing. Comm'r v. Ferrer, supra, 304 F.2d at 130–131. This was the element missing from the cases denying capital gains treatment.[2] To qualify as a capital asset the agency contract must have given Maryland some enforceable interest in the coal or in the mine. It may be helpful at this point to note what the contract did *not* give to Maryland: it did not give Maryland the right to the output of coal from the mine. Such a right might have been a sufficient interest in the coal or in Century's lease of the coal lands to warrant treating it as a capital asset. Comm'r v. Goff, supra; O'Connor v. United States, 155 F.2d 425 (9th Cir. 1946); cf. Comm'r v. Pittston Co., supra. But the right created here was sim-

---

1. Although the holdings in the General Artists and Starr Bros. cases were based on the absence of a "sale or exchange," the court in Comm'r v. Ferrer, 304 F. 2d 125 (2nd Cir. 1962), noted that those cases could have been decided on the ground that the "taxpayer held only a con-

tract right giving him an opportunity to earn future income." 304 F.2d at 131 n. 3.

2. See cases cited in text accompanying note 1, supra.

ply one to perform a service, that of an agent to sell his principal's interest in personal property, i. e., the coal which Century produced, which carries with it no interest in either the coal or the mine. Comm'r v. Pittston, supra. See also Gordon v. Comm'r, supra.

Maryland contends that the necessary interest to warrant capital asset treatment was provided by the grant of the *exclusive* right to sell, that the right extended to the *output* of the mine, and was to last for the *life of the mine*. This contention finds no support in the cases. An exclusive right to perform services was present in Eidson, Gordon, Roscoe, General Artists, Starr Bros., and Paul Small Artists, yet the courts there held that taxpayer did not have a capital asset. And in Comm'r v. Pittston Co., supra, although taxpayer had the same exclusive right to sell (purchase for resale) all coal produced as in the instant case, the court stated that taxpayer had simply a "naked contract" right without any direct interest in the mine or the coal produced. Id. at 348. The only difference between the facts in the Pittston case and those in the instant case is that in Pittston the contract was for ten years, while here it is "for the life of the mine." In the absence of authority to the contrary, I conclude that stating the duration of a contract for services in such terms does not, without more, create an interest in the mine. The elements of exclusivity, output and life of the mine all have bearing upon the value of the

rights created by the contract, not upon the nature of the rights.

It is as to the nature of the rights that inquiry must be made in determining capital asset status. Comm'r v. Gillette Motor Transport, Inc., supra; Comm'r v. Ferrer, supra, 304 F.2d at 129–130; 3B Mertens, Law of Federal Income Taxation § 22.34, at 155 (1958). Maryland's only right was to perform services for compensation. Its only means of redress for violation of that right was a suit for damages for breach. What Maryland "sold" or "relinquished"[3] to Century for $200,000 was the right to earn income in the future, or put in another form, the right to seek and recover damages for breach of that right. This was not property which, in any sense, appreciated in value over a substantial period of time. (If anything there was a continuing depreciation in the value of that right as the supply of coal depleted and the life of the mine diminished.) Nor was there present in what Maryland "sold" any element of goodwill. Perhaps Maryland sought to create that impression when it stressed that copies of all orders written by it were in Century's files which were turned over to Bethlehem upon consummation of the stock transaction, but that was information properly in Century's files under the terms of its contract with Maryland and was part of Century's assets when its stock was acquired by Bethlehem.[4] It is doubtful whether, under such

3. It does not matter which. In Comm'r v. Golonsky, 200 F.2d 72 (3rd Cir. 1952), cert. denied, 345 U.S. 939, 73 S. Ct. 830, 97 L.Ed. 1366 (1953), the court held that capital gains treatment was to be accorded taxpayer-lessee who received money from lessor for vacating leased premises and turning them over to lessor prior to expiration of the lease, and said: "Why then is a transfer of a leasehold interest by a tenant to a landlord not a 'sale?' To call the transaction a cancellation or termination of a lease and not a sale is, we think, to assume the point to be decided. Undoubtedly there is a cancellation of the lease when the tenants voluntarily surrender the prem-

ises to a landlord in accordance with an agreement, but the fact that the cancellation occurs does not negative the fact that the transaction may constitute a sale." 200 F.2d at 73.

4. Maryland argues as though it sold something to Bethlehem, perhaps because, under the mechanics of the transaction, Bethlehem paid $200,000 directly to Maryland. This, in my view, was of no significance. Bethlehem agreed to pay $1,500,000 for Century stock provided the liability of the Maryland contract was extinguished. The obligation to buy or to settle was that of the Century stockholders. That they were willing to have the purchaser of their stock pay a portion of the price di-

circumstances, Maryland had any interest in goodwill or customer lists to sell, but it is not necessary to decide that because it is abundantly clear that such rights were not the subject matter of this transaction. Goodwill and customer lists have value only in connection with carrying on a business. Bethlehem's intention was to have Century discontinue any business being done with its former customers. Bethlehem wanted all of the coal from this mine for its own use. Clearly, therefore, goodwill was no part of the rights disposed of by Maryland. Presumably, Maryland was still free to deal with its old customers for some other coal producer.

Two other points raised by Maryland require little comment:

First, Maryland points to the fact that the $200,000 price was not arrived at by a formula commuting future earnings. In Comm'r v. P. G. Lake, Inc., 356 U.S. 260, 78 S.Ct. 691, 2 L.Ed.2d 743 (1958) and Roscoe v. Comm'r, supra, the existence of a formula substituting present payment for future income [5] was considered of some importance in denying claimed capital gains treatment. Whatever probative value there may be in cases where a formula is in fact used, I perceive none in the failure, in this case, to use one. Here there is no question that the right involved is one to perform services and be compensated, or to sue for the breach thereof. Whatever Maryland and Century stockholders may have taken into account in arriving at the price, whether it reflected their respective like or dislike for prospective litigation, or whether it represented an expression of gratitude to Medford J. Brown, Maryland's president, for holding out against the lower offer, or whether it was arrived at by the flip of a coin does not change the nature of the right. The amount paid here was in settlement of a contract to perform services, in settlement of a prospective law suit whose measure of damages would be loss of future commissions. It is the nature of that right which determines the treatment to be accorded the amount paid. Comm'r v. Murdoch, 318 F.2d 414 (3rd Cir. 1963), cert. denied, 375 U.S. 879, 84 S.Ct. 149, 11 L.Ed.2d 111 (U.S. Oct. 21, 1963), rehearing denied, 84 S.Ct. 344 (U. S. Dec. 9, 1963).

Second, Maryland suggests that where there is an investment, there is a capital asset. It then argues that it made an investment by making loans available to Century. A similar circumstance was present yet capital asset treatment was rejected in Pittston. Without suggesting that a loan can never qualify as the risk capital necessary to investment in a capital asset, it is sufficient to state that the loans made by Maryland in this case were not made as an investment nor were they made in a capital asset.

## CONCLUSION

To the extent that there is disagreement in the facts of this case, I have accepted Maryland's version, consequently there are no issues of fact remaining for trial. It is appropriate, therefore, to grant defendant's motion for summary judgment if, as a matter of law, he is entitled to it. I have concluded that the payment for Maryland's rights under its contract with Century was properly treated by defendant as ordinary income and defendant's motion for summary judgment will be granted.

rectly to the holder of the claim to extinguish it effects no change in the nature of the transaction. It is as if the entire purchase price had been paid to stockholders, who then paid $200,000 of that price to settle Maryland's claim.

5. "The substance of what was assigned was the right to receive future income. The substance of what was received was the present value of income which the recipient would otherwise obtain in the future. In short, consideration was paid for the right to receive future income, not for an increase in the value of the income-producing property." Comm'r v. P. G. Lake, Inc., supra, 356 U.S. at 266, 78 S.Ct. at 695.