Argued June 1, affirmed September 11, 1970

FURRER, *Respondent and Cross-Appellant, v.*
INTERNATIONAL HEALTH ASSURANCE
CO., *Appellant and Cross-Respondent.*
474 P2d 759

*Roland F. Banks*, Portland, argued the cause for appellant. With him on the briefs were Mautz, Souther, Spaulding, Kinsey & Williamson, and Douglas M. Thompson, Portland.

*Preston C. Hiefield, Jr.,* Portland, argued the cause for respondent. With him on the briefs were Williams, Montague, Stark, Hiefield & Norville, and Larry C. Hammack, Portland.

Before SLOAN, Presiding Justice, HOLMAN, HOWELL, SCHWAB and LANGTRY, Justices.

HOWELL, J.

This case commenced as an action for a declaratory judgment concerning the right of the defendant to terminate an agreement whereby the plaintiff was engaged to develop insurance business for the defendant. After trial on the declaratory judgment proceedings a supplemental complaint for damages for breach of contract was filed. The action for damages was tried by the court without a jury and a judgment in the amount of $214,867.54 was entered against defendant. The defendant appeals and the plaintiff has filed a cross-appeal.

Prior to the execution in 1959 of the contract involved in this case, the Industrial Hospital Association, an Oregon corporation, was engaged primarily in the sale of group hospital-medical-surgical insurance policies. Industrial was interested in expanding its business to include sales to individuals in the same field. The plaintiff had been employed by another health insurance company, National Hospital Association, as sales manager for both individual sales and group protection. Plaintiff and Ray Brunkow, president of Industrial, discussed possible terms under which plaintiff would become associated with Industrial. Plaintiff's experience with National Hospital Association had been unsatisfactory and he had been

summarily released by the company. He made it clear to Industrial's president that before he undertook the job of organizing a sales agency program for Industrial he must be given "protection" from similar action by Industrial. The president of Industrial was fully aware of plaintiff's concern in this regard and testified:

"* * * [H]e wanted an agreement that would see a measure of protection in the event something happened to his relationship with us, that if he developed business he wanted to have it protected.

"* * *

"It was our thought that if, through his efforts, we developed this block of business in the health insurance area of our company's operations, that we would be unable to terminate the agreement once this block of business had been reached, * * *.

"This was to be his pension plan, in view of the fact that he was not eligible for the company's program for he was not an employee, and the business developed would be, in essence, his business and commissions would go for his lifetime."

On May 1, 1959, plaintiff and Industrial entered into a contract in which plaintiff agreed "to spend such time as he personally sees fit in developing agent agreements and in personal sales of Individual Membership." The plaintiff was to receive a graduated percentage of commissions based on total sales. The crucial part of the contract, and the focal point of the dispute in this case, stated:

"8. This Agreement shall take effect on the 1st day of May, 1959, and shall remain in effect for one year at which time it shall automatically renew itself from year to year unless the Special Agent shall give the Association sixty (60) days written notice in advance of his intention to terminate said Agreement and, in that event, no compensation

shall accrue to the Special Agent for dues received in the office of the Association on and after such termination date. The Association shall have the right to terminate said Agreement upon giving the Special Agent sixty (60) days written notice in advance of the termination date provided, however, that, in the event of such termination, the Association shall continue to pay the Special Agent such compensation as he would have been entitled to had his services not been terminated by the Association for a period of three (3) years on all dues received and accepted by the Association from Individual Members whose Memberships were sold for the Association by the Special Agent himself or by an Agent whose agents agreement was negotiated by the Special Agent. Provided, however, that said Agreement may not be terminated by the Association if the gross annual dues received and accepted by the Association for Individual memberships sold by the Special Agent or by agents whose agents agreements were negotiated by the Special Agent are equal to or exceed $500,000.00 and the pure claims loss is 60% or less on the net dues (gross dues less commissions paid)."

Plaintiff's efforts on behalf of Industrial were highly successful and by May 1965 an agency force of more than 800 agents had been created. The defendant concedes in its brief that "plaintiff conducted an aggressive and successful program to develop individual business, insofar as the *quantity* of such business was concerned."

In March 1961 the parties agreed that plaintiff was to receive certain travel expenses. In March 1962 a supplemental agreement was entered into providing that plaintiff would receive an additional 2 per cent commission from all dues received from the sale, by agents or company employees, of certain group contracts known as the "basic assured benefit plan."

In 1960 Industrial became concerned about possible legislation which might adversely affect companies in the hospital-medical insurance field, and a separate wholly-owned corporation, International Health Assurance Company of Washington, was organized. The parties agreed that the May 1, 1959, agreement between plaintiff and Industrial would be applied to International of Washington.

In 1963 another wholly-owned subsidiary, International Health Assurance Company of Oregon, was formed, and it was also agreed that the May 1, 1959, agreement would apply to International of Oregon.[1]

By 1965 the defendant was licensed to do business in nine western states and Alaska. In April 1965, after the corporate changes, the defendant engaged an accounting firm to make a study of the company. The report recommended that the May 1, 1959, agreement with plaintiff be modified "in order to eliminate the exclusive arrangement provided to one individual." The report also stated:

"This agreement has served the Company well by allowing it to put a sizable amount of Individual A&H premium on the books. It, in all probability, would enable the Individual A&H line of business to continue to expand. However, it is not compatible with the long-range growth objectives of the Company, in general, and the distribution methods which are required for a life and A&H carrier, in specific.

"The present arrangement is on the basis of distribution by specific product line in all areas of operation. This is a workable arrangement while

[1] In 1964 International of Washington was merged with International of Oregon. The controlling stock of Industrial was exchanged for stock in Pacific Insurance Investment Company. Industrial was dissolved, leaving International Health Assurance Company, the defendant herein, as the sole operating company.

the area in which the Company operates is limited. However, as the Company continues its expansion into new states, it is not to the Company's advantage to allow one individual to be responsible for developing so great a territory because the development is too slow and the same degree of saturation would not be effected as would in the case of many Special Agents."

The report also recommended that plaintiff's expense allowance be discontinued and "[t]his money should be allocated to advertising instead."

One of the individuals who participated in the report and its recommendations became senior vice-president of defendant corporation. He advised plaintiff that another person had been selected to take over the management of plaintiff's department; that plaintiff's travel expense allowance was terminated, and that he should turn in his credit card because he would no longer be reimbursed for gasoline expenses. Plaintiff also was requested by the vice-president and the counsel for the defendant to sign a new agreement dated January 1, 1966, which, among other things, would delete the state of California from plaintiff's jurisdiction and allow the defendant to put special agents in various geographical areas in competition with plaintiff.

Plaintiff refused to sign the new agreement and the defendant's board of directors in February 1966 advised plaintiff that they were terminating the May 1, 1959, agreement effective May 1, 1966.

Plaintiff filed a complaint for a declaratory judgment on May 4, 1966, and a protracted series of trials continued over a period of two years. The complaint requested a declaration of the rights of the parties with respect to the termination and compen-

sation provisions of the May 1, 1959, contract and requested that the defendant's termination of the contract be declared void. The plaintiff acknowledged in the complaint that defendant would be entitled to terminate the agreement as to Industrial because new and renewal insurance was not being issued by Industrial; consequently the gross dues received in 1965 were less than $500,000 and the pure claims loss ratio was in excess of 60 per cent as required by plaintiff's contract with defendant. However, the plaintiff would be entitled to compensation under the contract for commissions through April 30, 1969.

Later an amended complaint was filed. The court in a letter opinion found against the defendant on its right to terminate the contract and awarded the plaintiff $150,000 damages. Both parties objected to the amount of damages and the court withdrew the award. A judgment was not entered and plaintiff filed a supplemental complaint for damages for the wrongful termination of the contract. The defendant's answer to the supplemental complaint alleged that the contract was void for "lack of mutuality of obligation" and that an award of damages should be reduced by "the cost and expenses which would have been incurred by plaintiff in continuing to perform the contract and by plaintiff's profits and earnings subsequent to the alleged breach of agreement."

After a trial before the court without a jury on the issues raised by the supplemental complaint, the court entered findings of fact and conclusions of law and a judgment awarding plaintiff damages in the sum of $214,867.54.

In its brief in this court defendant states that it is not appealing from the decision of the court after

the first trial that the May 1, 1959, contract was improperly terminated by the defendant.

While the primary issue in this case involves the amount of damages awarded plaintiff, the defendant also contends that the May 1, 1959, agreement was unenforceable and subject to termination by either party insofar as it remained executory. In support of this contention the defendant cites various cases which hold that an executory contract of agency for an indefinite term may be terminated at will and without liability to either party. The authorities cited are not applicable because no time limits were established in the agency agreements nor was the period of time ascertainable by any fixed criteria.

■ In the instant case the May 1, 1959, agreement was not for an indefinite term. It was to remain in effect for one year with an automatic renewal each year unless terminated by plaintiff by giving 60 days' notice. It could be terminated with 60 days' notice by defendant only if the plaintiff's sales were less than $500,000 per year and the pure claims loss was 60 per cent or more.

In *Tanenbaum Textile Co. v. Sidran*, 423 SW 2d 635, 637 (Tex Civ App 1967), cited by defendant, the court stated that a determination that a contract is sufficiently definite is favored particularly where one party has performed. In the instant case it is conceded that the plaintiff performed by conducting an "aggressive campaign" from May 1959 until February 1966 in building defendant's individual insurance business.

■ The defendant contends that the contract was subject to termination by either party because (1) it was not sufficiently definite in its terms as plaintiff

could or could not perform as he saw fit, and (2) the contract lacked mutuality.

In support of these contentions the defendant points out that the agreement states that plaintiff "agrees to spend such time as he personally sees fit" in developing agency agreements and personal sales. Therefore, defendant contends, such a contract lacks mutuality and is not sufficiently definite in its terms to be enforceable.

Again, the cases cited by defendant are not applicable. In *Red Wing Shoe Co. v. Shepherd Safety Shoe Corp.*, 164 F2d 415, 417 (7th Cir 1947), the agency contract did not state the quantity, quality or price of shoes the agent was to purchase. The agreement in *Jacob Schmidt Brewing Co. v. Minot Beverage Co.*, 93 F Supp 994, 999 (D ND 1950), made no reference to the price or amount of beer the agent was to purchase and sell. In *E. I. DuPont deNemours & Co. v. Claiborne-Reno Co.*, 64 F2d 224 (8th Cir), *cert. denied*, 290 US 646 (1933), the agency contract was to continue as long as the agent's services were satisfactory in the seller's opinion.

In *Terre Haute Brewing Co. v. Dugan*, 102 F2d 425, 426 (8th Cir 1939), cited by defendant, the court held that a contract, whereby a beer distributor was given an exclusive agency to sell beer as long as he was in the beer business and devoted his time and attention to it, was void for lack of mutuality because the distributor had not bound himself and could refuse to continue as a distributor.

We believe that a case more in point is *Wood v. Lucy, Lady Duff-Gordon*, 222 NY 88, 118 NE 214 (1917). The defendant was a fashion designer whose endorsements on products increased their value and

sales. The defendant employed plaintiff to place her endorsements on designs for one-half the profits. The exclusive right was to last one year and thereafter from year to year unless terminated by 90 days' notice. The defendant withheld the profits on some sales and plaintiff sued for damages for breach of contract. The defendant contended that the agreement lacked the elements of a contract because the plaintiff had not actually bound himself to spend any time promoting or selling defendant's endorsement. The court stated:

> "It is true that he does not promise in so many words that he will use reasonable efforts to place the defendant's indorsements and market her designs. We think, however, that such a promise is fairly to be implied. The law has outgrown its primitive stage of formalism when the precise word was the sovereign talisman, and every slip was fatal. It takes a broader view today." 118 NE at 214.

A similar argument of lack of consideration and illusoriness in an agreement to manufacture and market a product was raised in *Perma Research and Development Co. v. Singer Co.*, 410 F2d 572 (2d Cir 1969). Relying on *Wood v. Lucy, Lady Duff-Gordon, supra*, the court stated:

> "* * * Equally frivolous is the argument based on illusoriness, since Singer was obligated to use its best efforts to manufacture and market the product *even if the agreement did not expressly say so*." 410 F2d at 574, n 8.

Professor Corbin states the following concerning mutuality of obligation in contracts:

> "Mutuality of obligation should be used solely to express the idea that each party is under a legal duty to the other; each has made a promise and each is an obligor." 1A Corbin, Contracts § 152, p 4.

Regarding lack of mutuality in sales agency agreements, Professor Corbin further states:

"Often a sales agency contract does not fix the amount of goods or the number of articles that the agent must take or sell. These exigencies of business often require that this must be left flexible, so that it may vary with general business conditions and with manufacturing needs and difficulties. Such a contract usually contains various subsidiary promises on both sides. Such subsidiary promises are sufficient consideration for any return promises, so that the contract should not be held void for lack of 'mutuality.' Promises by the agent to advertise and to promote sales with diligence and by the manufacturer to supply goods to any reasonable extent as ordered are readily to be found by implication. These implied promises also are sufficient consideration and are not so indefinite or uncertain as to be unenforceable." 1A Corbin, *supra*, § 155, p 26.

See also *Medak v. Hekimian*, 241 Or 38, 404 P2d 203 (1965), and *Temple Enterprises v. Combs*, 164 Or 133, 100 P2d 613 (1940).

The May 1959 agreement was definite in its terms and was supported by a valuable consideration.

■ The defendant contends that if the first termination notice constituted a breach of the agreement, the plaintiff's rejection of the notice continued the contract in existence subject to a subsequent termination by either party on proper grounds.

The first termination notice was sent by the defendant to the plaintiff on February 28, 1966, and was to be effective May 1, 1966. On October 26, 1966, the defendant sent the plaintiff another notice of termination of the 1959 agreement to be effective as of December 31, 1966. The latter notice stated that

it was not intended "to take anything away from the termination notice of February 28, 1966," and was given in the event that the court found that the first notice of termination was invalid.  . . .

The defendant argues that plaintiff did not treat the termination notice of February 28, 1966, as a breach of the contract and therefore the contract continued until December 31, 1966, when, according to the defendant, it was properly terminated. The defendant states that plaintiff took the position in his complaint for a declaratory judgment that the termination notice was invalid and prayed for a judgment that the defendant be prohibited from terminating the May 1959 agreement. It is true that plaintiff's prayer requested that the termination notice be declared void. However, the plaintiff also requested the court to declare the rights and obligations of the parties respecting the termination notice and plaintiff conceded that the termination was valid as to Industrial because the premiums received by Industrial were less than $500,000 in 1965 and the pure claims loss ratio was more than 60 per cent.

Defendant relies on the rule that the repudiation of an executory contract does not operate as a breach until such repudiation is treated as a breach by the other party.[2] *Swick v. Mueller*, 193 Or 668, 677, 238 P2d 717 (1952); *Peeler v. Tarola Motor Co.*, 170 Or 600, 134 P2d 105 (1943). However, the rule is subject to the qualification that the power of the repudiator of the contract to retract exists as long as there

---

[2] Corbin states the following concerning this rule: "In a number of well-considered recent cases, this doctrine that an anticipatory repudiation is not a breach until it is accepted as such by the injured party has been repudiated. Their reasoning is convincing and they should now be accepted as having established the law." 4 Corbin, Contracts § 981, p 938.

has been no substantial change of position by the injured party. 4 Corbin, Contracts § 981, p 939. See also 1 Restatement, Contracts § 319.

Shortly after plaintiff had been advised by the new vice-president that another person had been selected to take over his position, that his expense allowance was terminated and he had received the termination notice of February 28, 1966, he accepted a position with another insurance company. The plaintiff's action does not indicate that he refused to accept the termination notice since he changed his position by accepting employment with another insurance company—a change which appeared to be extremely reasonable under the circumstances.

We agree with the trial court that the contract was wrongfully terminated by the February 28, 1966, notice.

The defendant argues that the award of damages for future commissions lost by plaintiff was not established with reasonable certainty.

■ Proof of damages for loss of profits must be established with reasonable certainty. *Buck v. Mueller*, 221 Or 271, 351 P2d 61 (1960); *Stubblefield v. Montgomery Ward & Co.*, 163 Or 432, 96 P2d 774 (1939). However, damages should not be disallowed because they cannot be exactly calculated. It is sufficient if, from proximate estimates of witnesses, a satisfactory conclusion can be reached. *Buck v. Mueller, supra.* Among the factors which may be considered are whether the business is speculative in nature and whether a profit was earned in the past. *Douglas Const. v. Mazama Timber*, 256 Or 107, 471 P2d 768 (1970).

*Wallace v. American Life Ins. Co.*, 111 Or 510, 225 P 192 (1924), is a case very similar to the case at bar.

The insurance agent brought an action against his company for breach of the agency contract. Regarding the elements to be considered in determining plaintiff's loss of profits the court adopted the following quotation from *Wells v. National Life Assn. of Hartford*, 99 F 222, 236 (5th Cir 1900):

> " 'The condition of the business in Texas at the time of the breach; the means that had been used and were being used by the plaintiff to work the territory allotted to him; the machinery which he had organized for the purpose of that work; the reasonable cost of its continued operation; the extent of the territory allotted to him; the number of persons therein who were fit subjects for such insurance as the defendant proposed to write; the reasonable relative proportion of cost for the first year of organizing the business and putting it in operation, to the cost of continuing its conduct during the subsequent years; the machinery actually used by the defendant after it entered the territory allotted to the plaintiff, and its success, through the use of this machinery and the agencies it established, in obtaining applicants for insurance and holders for its policies, should all be given to the jury, * * *.' " *Wallace v. American Life Ins. Co.*, *supra* at p 532.

In the instant case two certified public accountants, a professor of insurance and insurance consultant, and an actuary experienced in the insurance field testified for plaintiff at the trial. The actuary prepared a study and submitted a report in which he made a determination of the commissions plaintiff lost as a result of the defendant's breach of the contract. The amount of loss was reduced to present value based on low, medium and high projections of the estimated loss and also based upon commissions plaintiff would have earned to age 65, 70 and for life

at an interest rate of 4½ per cent. His results were as follows:

## INTERNATIONAL HEALTH ASSURANCE COMPANIES OF WASHINGTON & OREGON

| Commissions Based Upon Production | Low Projection | Medium Projection | High Projection |
|---|---|---|---|
| 1) To Age 65 | $474,047 | $572,653 | $ 669,460 |
| 2) To Age 70 | 506,718 | 682,997 | 858,216 |
| 3) Throughout Furrer's lifetime | 535,124 | 873,103 | 1,210,621 |

The actuary's report was based, at least in part, on reports of a certified public accountant who was formerly employed by Industrial Hospital. The actuary testified that he considered, among other factors, the insurance market available, the quality of the product, economic conditions and that he based his low projection upon the established insurance market and not upon the opening of additional markets in other areas.

The defendant's financial vice-president testified that he had examined the defendant's records and admitted that the plaintiff would have earned commissions from both Industrial and International in the sum of $41,944.86 for 1966 (less $24,000 paid to plaintiff in 1966); $40,542.44 in 1967; $42,123.91 in 1968, and, based on a future projection, plaintiff would have earned $42,126.09 in 1969.

The trial court accepted the low projection of $474,047 of the actuary's report, but used an interest rate of 6 per cent instead of 4½ per cent, or the sum of $429,607 as the present value as of December 1, 1968, of commissions payable to plaintiff in the future from International.

The court determined the present value of commissions due from Industrial for the years 1966, 1967,

1968 and 1969, but allowed defendant credit for commissions paid to plaintiff in 1966 prior to the termination on May 1, 1966. The court also gave defendant credit for expenses plaintiff would have incurred in performing the contract under the future projection and for wages plaintiff would have earned from other employment after termination of his services with defendant.

The judgment entered by the trial court for $213,011.48, plus interest, was based on the following computations:

1. Present value as of December 1, 1968, of commissions payable to the plaintiff in the future commencing with the calendar year 1968     $429,607.00

2. Present value as of December 1, 1968, of past and future commissions through July 1, 1969, under the March 27, 1962, supplemental agreement     3,972.42

3. Present value of commissions for the year 1966, with interest at 6 per cent from January 1, 1967, through December 1, 1968 from Industrial and International     46,900.95

4. Present value of commissions from International for 1967, with interest, to December 1, 1968     29,705.75

5. Present value of commissions payable from Industrial for 1967 with interest at the rate of 6 per cent     13,363.83

6. Present value as of December 1, 1968, of commissions from Industrial for 1968     12,770.95

7. Present value of commissions from Industrial from January 1, 1969, through May 30, 1969, discounted at 6 per cent from April 30, 1969, to December 1, 1968     4,048.20

    $540,369.10

Less:

1. Present value of expenses of plaintiff to perform under the contract at the rate of $700 per month starting with 1966     81,067.66

2. Present value as of December 1, 1968, of future earnings of plaintiff from other employment     199,955.69

3. Present value as of December 1, 1968, of commissions heretofore paid to plaintiff in calendar year 1966     28,334.27

4. Present value as of December 1, 1968, of earnings from wrongful termination (May 1, 1966 to December 1, 1968)     18,000.00

    $327,357.62

Amount of Judgment     $213,011.48

■ Although the defendant contends that Industrial's loss ratio was increasing, that the actuary criticized defendant's management policies and that the determination of profits over a period of future time presented problems of proof, we conclude that there was substantial evidence to support the trial court's judgment in favor of plaintiff in the sum of $213,011.48 plus interest and costs. The trial court conscientiously and carefully followed the testimony during the trial and, of course, had the opportunity to observe all the witnesses.

■ The plaintiff has filed a cross-appeal from the judgment and contends that the trial court should not have reduced the damages by the amount that the court determined the plaintiff would have earned at other employment. After plaintiff's services were terminated by the defendant, the plaintiff became sales

manager for another insurance company at a salary of $18,000 per year. In arriving at the amount of the judgment for plaintiff the trial court, in mitigation of damages, deducted an amount equal to $18,000 per year compounded annually for ten years at the rate of 10 per cent and reduced to a present value as of December 1, 1968. The plaintiff's argument that he should not be required to mitigate his damages is completely without merit and would amount to an unwarranted windfall to the plaintiff. It would be the same as if plaintiff were working for and drawing commissions from two insurance companies for ten years from December 1, 1968. Income received from other employment is a proper item in mitigation of damages in an action by a general insurance agent for breach of his agency contract. *Wallace v. American Life Ins. Co., supra*; 43 Am Jur 2d 207, Insurance § 152.

The trial court properly deducted the present value of plaintiff's future earnings in determining the amount of the judgment to be awarded the plaintiff.

The judgment of the trial court is affirmed.