RALPH FURRER and ROSEMARIE FURRER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Furrer v. Commissioner
Docket No. 1246-75.
United States Tax Court
T.C. Memo 1976-331; 1976 Tax Ct. Memo LEXIS 74; 35 T.C.M. (CCH) 1525; T.C.M. (RIA) 760331; October 28, 1976, Filed Gary M. Anderson and Preston C. Hiefield, Jr., for the petitioners. Gary R. DeFrang, for the respondent. FORRESTER
MEMORANDUM FINDINGS OF FACT AND OPINION FORRESTER, Judge: Respondent has determined a deficiency in petitioners' Federal income tax for the taxable year 1970 in the amount of $38,530.74. Concessions having been made, there are two issues for our decision: (1) Whether a judgment award recovered by petitioner for *76 an insurance company's breach of a special agency contract is taxable as ordinary income or capital gain; and (2) Whether claimed deductions for the operating and depreciation expenses of a boat should be disallowed pursuant to section 274(d). [1]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners Ralph Furrer and Rosemarie Furrer, husband and wife, resided in Tigard, Oregon, at the time they filed the petition herein. Petitioners filed a joint Federal income tax return for 1970 with the office of the Internal Revenue Service at Ogden, Utah. Petitioner Ralph Furrer (hereinafter petitioner) worked for the National Hospital Association (NHA) from 1935 to 1946.He returned to NHA in 1953 to develop individual policies and an agency force for NHA, which, at that time, was primarily marketing group insurance and limited individual policy coverage for group conversions. Petitioner was executive sales manager and a member of NHA's board of directors and, during the time he worked for that company, he developed new individual policies and an *77 agency force of 400 to 500 agents.
On May 1, 1959, petitioner entered into a special agency agreement with Industrial Hospital Association, subsequently International Health Assurance Co. (both companies hereinafter referred to as IHA). The 1959 agreement was applied, by mutual consent, to IHA of Washington and IHA of Oregon which were wholly owned subsidiaries of IHA formed in 1960 and 1963, respectively. By December 1965, both IHA and IHA of Washington had merged into IHA of Oregon. Under the 1959 agreement, IHA appointed petitioner as special agent and authorized him to solicit qualified agents as sales representatives for IHA's individual membership department and to negotiate agency agreements with such agents on behalf of IHA. Petitioner was also authorized to sell IHA's individual insurance. The agreement provided for petitioner's compensation on a commission basis with such commissions computed as a percentage of gross dues received by IHA on individual insurance policies. Petitioner agreed that such commissions would be his only compensation from IHA and that all other expenses, such as travel and telephone expenses, would be borne by him. The agreement specifically *78 provided that there was no intention between the parties to create an employer-employee relationship and that neither the agreement nor any earned commission under it could be assigned or transferred without the written approval of IHA. The agreement could be terminated by either party upon 60 days' notice. However, if IHA terminated the agreement, it was required to continue to pay the special agent such compensation as he would have been entitled had his services not been terminated for a period of three years on all dues received and accepted on individual policies sold by the special agent personally or agents whose agency agreements were negotiated by the special agent. The 1959 agreement provided further that it could not be terminated if the gross annual dues received and accepted by IHA on individual policies sold by the special agent, or agents whose agreements were negotiated by him, exceeded a designated amount and if the claims on these individual policies were below a specified percentage of the gross dues received by IHA. During the years 1959 to 1965, inclusive, petitioner received compensation pursuant to the 1959 agreement, and he reported such compensation as *79 ordinary income on his Federal income tax returns filed for those years. By 1965, petitioner had developed an agency force of over 800 active agents generating gross dues from individual policies in 1965 in excess of $900,000. Petitioner likewise was instrumental in the development of the "dollar deductible policy" which the IHA companies (IHA, IHA of Oregon, and IHA of Washington) offered for sale. However, insurance policies which are offered for sale are filed with the Insurance Commissioner and are available for inspection and copying by all insurance companies. It is common for an insurance company to use concepts developed by other companies and, in fact, insurance concepts which petitioner felt he had developed while associated with the IHA companies were subsequently used by other insurance companies. Written agency agreements were executed between the IHA companies and the insurance agents who sold their insurance, and the IHA companies were designated as the principal in these agreements. However, several agents who worked under petitioner at IHA have become agents for petitioner's subsequent employer, Prudential Health Association (PHA). Petitioner was instrumental *80 in the development of these agency agreements. While associated with the IHA companies, petitioner maintained files on the agents that he supervised. These files contained the agency agreements, renewal agreements, and correspondence concerning claim disputes. Upon termination of petitioner's special agency agreement, the IHA companies took possession of these files. While petitioner was associated with the IHA companies, they provided him office space and secretarial help at no charge.During the period from 1959 to 1965, the IHA companies incurred advertising expenses of $101,600. In connection with his activities as a representative of the IHA companies, petitioner incurred expenses of approximately $60,000 for travel and other items for which he received no reimbursement from the IHA companies. In February 1966, IHA of Oregon notified petitioner that it was terminating the 1959 agreement as of May 1, 1966. On May 4, 1966, petitioner filed a complaint for a declaratory judgment in the Circuit Court of the State of Oregon for Multnomah County. The case was tried without a jury, and by a letter dated October 17, 1967, the court notified the parties of its opinion. This *81 letter opinion held that IHA of Oregon (known as International Health Insurance Co. at the time of trial) had wrongfully terminated the 1959 agreement, and the court awarded petitioner $150,000 as compensation "for his services." This letter opinion was later modified by eliminating reference to the $150,000 award. On December 20, 1967, petitioner filed a supplemental complaint in the state court proceeding seeking damages for breach of contract. At the conclusion of the damages trial, the court entered a decision for petitioner in the amount of $213,011.48. In computing the amount of damages, the trial court computed the present value of the commissions lost because of IHA's unlawful termination and subtracted from this amount, (1) the present value of the expenses necessary to perform the contract, (2) the present value of petitioner's earnings subsequent to the termination of the 1959 agreement, and (3) certain payments already made to petitioner by IHA. The trial court decision was affirmed on appeal in 1970 by the Supreme Court of Oregon in an opinion reported at 256 Ore. 429 and 474 P. 2d 759. The pleadings in the above-described state court *82 proceedings did not assert claims for the value of the records that petitioner maintained or for the goodwill and agency force that he developed during his association with IHA. As a result of the circuit court's decision, as affirmed by the Oregon Supreme Court, petitioner, in 1970, received $213,011.48 as damages for breach of contract and $24,307.29 as interest on the judgment. He incurred expenses of $65,963.54 for attorneys' fees and court costs.
On his 1970 return, petitioner reported the $213,011.48 as capital gain income and allocated the deduction for attorneys' fees and court costs between the award and the interest. On a schedule attached as part of petitioner's return, he reported the interest on the award, less the allocable portion of attorneys' fees and court costs, as ordinary income, but, inadvertently, this amount was not carried forward from the schedule and included as a part of petitioner's adjusted gross income. Petitioner has conceded such inadvertent error. In his statutory notice, respondent determined the amount received as damages and the interest thereon to be ordinary income and allowed the full amount of the attorneys' fees and court costs as a *83 deduction from ordinary income. The parties have stipulated that petitioner should be allowed a deduction for attorneys' fees and court costs totaling $65,963.54 for the taxable year 1970 regardless of the characterization of the breach of contract award. However, if the award is characterized as capital gain income, then, by stipulation, $58,700 of the attorneys' fees and court costs should be applied as a deduction in the computation of net long-term capital gain income and the remainder of such fees and costs should be applied as a reduction in computing net interest income. During 1970, petitioner incurred the following expenses in connection with a boat that he owned: Repairs
$ 857.97
Moorage
452.73
Gasoline, supplies, etc.
2,213.68
Insurance
319.00
Depreciation
919.27
Total:
$4,762.65 In his petition filed herein, petitioner claims 75 percent of these expenses ($3,571.99) as a business expense deduction. [2]
*84 Petitioner kept a boat guest register for the period July 22, 1970 to September 20, 1970. The register entries included the names of the passengers and, in a few cases, their employer and business address. Only one entry included petitioner's business relationship to the passenger. No records were kept of those occasions on which the boat was used for personal purposes. Petitioner has conceded that claimed deductions of $3,086.53 for rental expenses and $2,429.98 for travel and entertainment expenses were properly disallowed by the Commissioner. OPINION The first issue for our consideration is the treatment of an amount totaling $213,011.98, which was awarded petitioner as damages for IHA's breach of contract. Petitioner argues first that the 1959 agreement was highly unique and that his collective rights thereunder constituted intangible property rights which were capital assets as defined under section 1221. [3] He contends that these intangible property rights were transferred to IHA in exchange for the damages award so that his gain is long-term capital gain within the meaning of section 1222(3). [4] Respondent argues that the loss of petitioner's right to receive *85 commission income under the agreement was the only asserted claim in the state court proceedings and the only basis for which damages were awarded by that court. Respondent's position is that such a right is not a capital asset under section 1221 and, accordingly, the amounts received by petitioner constitute ordinary income. *86 The nature of the underlying claim and the actual basis of recovery govern the characterization of amounts received in a judgment settlement as either ordinary or capital gain income. Thomson v. Commissioner,406 F. 2d 1006 (9th Cir. 1969); Spangler v. Commissioner,323 F. 2d 913 (9th Cir. 1963); State Fish Corp.,48 T.C. 465 (1967), and cases cited therein. In the instant case, the complaints filed in petitioner's declaratory judgment suit and the subsequent damages trial assert claims based solely on the petitioner's right to receive commission income under the 1959 agreement. Although petitioner argues otherwise, these complaints simply do not assert claims for the value of any rights which petitioner may have possessed in the goodwill, files and records or the agency force which he created while associated with IHA. It is true that the Oregon Supreme Court took a broader view of the evaluation problem than that delineated by the pleadings. However, even if the damages awarded in the state court proceedings were intended to compensate petitioner for all the property transferred, if any, it is obvious that the real value *87 was in the right to receive future commissions. Joseph W. Brown,40 T.C. 861 (1963). The damages award did not represent the value of any goodwill, agency force, or records that petitioner transferred to IHA. Petitioner did not transfer any goodwill to IHA. Petitioner introduced no evidence indicating that he entered into a covenant not to compete with IHA. Apparently, he was perfectly free to contact the agents that he had obtained for IHA and to enlist them as agents for his new employer, PHA, as soon as his contract with IHA was terminated. In fact, the record shows that some IHA agents did become agents for PHA. Accordingly, whatever goodwill petitioner built up for IHA while acting as its special agent resulted from his services as such agent and belonged to IHA, and whatever goodwill petitioner built up for himself as a special agent or an insurance agent while he served IHA under the special agency contract, he retained. Vaaler v. United States,454 F. 2d 1120 (8th Cir. 1972); Elliott v. United States,431 F. 2d 1149 (10th Cir. 1970); Harry M. Flower,61 T.C. 140 (1973), affd. 505 F. 2d 1302 (5th Cir. 1974). *88 [5] Likewise, the agents that petitioner obtained for IHA entered into agency agreements with IHA as principal, and these agents remained, as before, agents of IHA after petitioner left IHA. Vaaler v. United States,supra. Petitioner retained any personal goodwill that he may have built up through his contacts with these agents and the right to such personal goodwill was the only property right that he had in the agency force. Harry M. Flower,supra.
Furthermore, on the basis of the record in this case, we cannot conclude that petitioner had a right of ownership in the records that he left with IHA, *89 or to the exclusive use of the information contained therein. Petitioner has not shown that these were personal records prepared for his own legitimate purposes so that they belonged to him. Elliott v. United States,supra;Port. Inv. Co. v. Oregon Mut. Fire Ins. Co.,163 Ore. 1, 94 P. 2d 734 (1939); National Fire Ins. Co. v. Sullard,97 App. Div. 233, 89 N.Y.S. 934 (2d Dept. 1904). Additionally, petitioner has not shown that the information contained in such records was unavailable to IHA from other sources. In Commissioner v. Gillette Motor Co.,364 U.S. 130, 134 (1960), Mr. Justice Harlan, writing for the Court, stated: While a capital asset is defined in section 117(a)(1) as "property held by the taxpayer," it is evident that not everything which can be called property in the ordinary sense and which is outside the statutory exclusions qualifies as a capital asset. This Court has long held that the term "capital asset" is to be construed narrowly in accordance with the purpose of Congress to afford capital-gains *90 treatment only in situations typically involving the realization of appreciation in value accrued over a substantial period of time, and thus to ameliorate the hardship of taxation of the entire gain in one year. Burnet v. Harmel,287 U.S. 103, 106. Accordingly, the damages award in this case did not compensate petitioner for the loss of any property which qualifies as a capital asset under section 1221. The damages award represented the value of petitioner's right to receive future commission income under the special agency contract, which right is not "property" for purposes of section 1221 and, therefore, not a "capital asset" as defined in section 1221. Commissioner v. P.G. Lake, Inc.,356 U.S. 260 (1958); Vaaler v. United States, supra;Commissioner v. Ferrer,304 F. 2d 125 (2d Cir. 1962). [6]
*91 Petitioner next argues that even if the damages award represented only the value of his right to future commissions, which is not a capital asset under section 1221, he is, nevertheless, entitled to have the proceeds of such damages award treated as a capital gain by negative implication of section 1253[7] which specifies an instance in which the transfer of an exclusive business franchise "shall not be treated as a sale or exchange of a capital asset." Petitioner reasons that since the breach of the special agency contract constituted the transfer of an exclusive business franchise[8]and since the section 1253 prohibition does not apply, he is therefore entitled to have the proceeds of such damages award treated as a capital gain. We disagree. We hold that in those transactions covered by section 1253, the taxpayer is entitled to capital-gains treatment only if the prohibition of section 1253 does not apply and the requirements of section 1221 and 1222 are met. Section 1222 defines long-term capital gain as the gain from the (1) sale or exchange (2) of a capital asset (3) held *92 for more than six months. The first sentence of section 1221 defines a capital asset as " property held by the taxpayer" (emphasis supplied) subject to several exclusions, one of which is section 1221(1) excluding "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." Having *93 found no cases on point, we have looked to the legislative history of section 1253 which makes it clear that the section was intended to deal with the problems of (1) whether the transfer of a franchise is to be treated as a sale or license and (2) whether the transferors are selling franchises in the ordinary course of business.[9] By a careful study of its legislative history, we have concluded that, with respect to the transfer of franchises, section 1253 was intended to clarify the term "sale or exchange" as used in section 1222 and to eliminate the interpretive problems arising under section 1221(1), but we have found no evidence whatever that the section was intended to change the meaning of the term "property" for purposes of section 1221 or to eliminate the "capital asset" requirement as a prerequisite for capital-gains treatment. The courts have quite uniformly held that the right to receive future income is not "property" as defined by section 1221 so that gain from its sale or exchange cannot be capital gain. Vaaler v. United States,supra, and the cases *94 cited therein. We are not persuaded that section 1253 was intended to change this well-established legal principle absent a clear expression of congressional intent to do so, accord, United States v. Barnes,222 U.S. 513, 520 (1912), and we are unable to find an expression of such intent in this instance. Accordingly, we hold that petitioner is not entitled to treat his gain from the damages award as capital gain because it is not gain from the sale or exchange of a capital asset and Congress, by enactment of section 1253, has neither changed the general definition of a capital asset nor has it eliminated the "capital asset" requirement of section 1222 with respect to the transfer of exclusive business franchises. We must next consider whether respondent has properly disallowed claimed deductions for the operating and depreciation expenses of a boat pursuant to section 274(d). [10] Petitioner's boat is a facility used in connection with entertainment, amusement, or recreation, and expenses with respect to it are disallowed unless the petitioner establishes that the facility is (1) used primarily for the furtherance of petitioner's trade or business and (2) *95 that the expense is directly related to the conduct of such trade or business. Sec. 274(a). The Income Tax Regulations, promulgated pursuant *96 to section 274(h), amplify and clarify the requirements of section 274(d). These regulations have been held to be generally in accordance with the statute. William F. Sanford,50 T.C. 823 (1968), affd. per curiam 412 F. 2d 201 (2d Cir. 1969). Section 1.274-5(c)(6)(iii), Income Tax Regs., requires the taxpayer to maintain records of each use of the facility containing such information as tends to establish its primary use. For each business use of the facility, such records should contain the amount, time, place, and business purpose of the entertainment, and the business relationship to the taxpayer of the persons entertained. For each personal use of the facility, such records should contain an appropriate description of the personal use including cost, date, number of persons entertained, the nature of the entertainment and, if applicable, information such as mileage or its equivalent. Moreover, the regulations state: If a taxpayer fails to maintain adequate records concerning a facility which is likely to serve the personal purposes of the taxpayer, it shall be be presumed that the use of such facility was primarily *97 personal. Sec. 1.274-5(c)(6)(iii). Petitioner has failed to maintain adequate records concerning his boat, a facility likely to serve personal purposes, because he has failed to make a record of each use of the boat. Furthermore, petitioner has not overcome the presumption of primary personal use as set forth in section 1.274-5(c)(6)(iii), Income Tax Regs., because he has failed to substantiate--either by adequate records or by sufficient evidence corroborating his own statement--the business purpose and the business relationship to petitioner of the persons entertained for more than half of the days on which the boat was used. [11]
Since petitioner has not established that more than 50 percent of the total calendar days of boat usage were days of business use, we hold that *98 petitioner has not established that the boat was used primarily for furtherance of his trade or business in the taxable year 1970. John L. Ashby,50 T.C. 409 (1968); Sec. 1.274-2(e)(4)(iii), Income Tax Regs.
Decision will be entered for the respondent. Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954.↩
2. On his 1970 income tax return, petitioner only claimed $2,647.71 (75 percent of $3,530.27) as a deduction for boat expenses. In his statutory notice, respondent disallowed such deduction. However, the petition herein claims an additional deduction of $924.28 for boat operating and depreciation expenses. Although the stipulation of facts states that the boat expenses are increased because certain expenses which are now listed as boat expenses were included in other expense categories on the return, respondent has not asked that the amount of any expenses, which he has previously allowed, be decreased in order to offset the increase in the claimed deduction for boat expenses.↩
3. SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include-- (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; (2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business; (3) a copyright, a literary, musical, or artistic composition, a letter or memorandum, or similar property, held by-- (A) a taxpayer whose personal efforts created such property, (B) in the case of a letter, memorandum, or similar property, a taxpayer for whom such property was prepared or produced, or (C) a taxpayer in whose hands the basis of such property is determined, for purposes of determining gain from a sale or exchange, in whole or part by reference to the basis of such property in the hands of a taxpayer described in subparagraph (A) or (B); (4) accounts or notes receivable acquired in the ordinary course of trade or business for services rendered or from the sale of property described in paragraph (1); or (5) an obligation of the United States or any of its possessions, or of a State or Territory, or any political subdivision thereof, or of the District of Columbia, issued on or after March 1, 1941, on a discount basis and payable without interest at a fixed maturity date not exceeding one year from the date of issue. ↩
4. SEC. 1222. OTHER TERMS RELATING TO CAPITAL GAINS AND LOSSES. * * *
(3) Long-term capital gain.--The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing gross income.↩
5. Roy W. Johnson,53 T.C. 414 (1969), upon which petitioner relies, is distinguishable on the ground that the petitioners in Johnson entered into a covenant not to compete with the buyer pursuant to the contract for the sale of their general insurance agency business. In Johnson(supra↩ at 425-426), we said, "the covenant not to compete was closely related to the sale of goodwill and therefore failed to have any independent significance apart from merely assuring the effective transfer of that goodwill."
6. Petitioner relies upon Jones v. Corbyn,186 F. 2d 450 (10th Cir. 1950), and Sammons v. Dunlap, an unreported case (N.D. Tex. 1952), 44 AFTR 924, 52-2 USTC par. 9481), as authority for treating his rights under the special agency contract as capital assets.These cases, however, are not persuasive authority in support of petitioner's position. In Elliott v. United States,431 F. 2d 1149, 1154 (10th Cir. 1970), the court that decided Jones v. Corbyn noted that it no longer "stood * * * as the law of this circuit, unqualified or unmodified." Likewise, the decision in the Sammons case is unpersuasive because it is based on a very brief oral opinion without the citation of any case law or any authority whatever. Hyatt v. Commissioner,325 F. 2d 715 (5th Cir. 1963), affg. a Memorandum Opinion of this Court. Furthermore, the Sammons decision is subject to the subsequent decision of the Court of Appeals for the Fifth Circuit in Roscoe v. Commissioner,215 F. 2d 478 (5th Cir. 1954), which although not citing Sammons, strongly questions its rationale. See Maryland Coal & Coke Co. v. McGinnes,225 F. Supp. 854 (E.D. Pa. 1964), affd. 350 F. 2d 293↩ (3d Cir. 1965).
7. SEC. 1253. TRANSFERS OF FRANCHISES, TRADEMARKS, AND TRADE NAMES. (a) General Rule. --A transfer of a franchise, trademark, or trade name shall not be treated as a sale or exchange of a capital asset if the transferor retains any significant power, right, or continuing interest with respect to the subject matter of the franchise, trademark, or trade name. (b) Definitions. --For purposes of this section-- (1) Franchise. --The term "franchise" includes an agreement which gives one of the parties to the agreement the right to distribute, sell, or provide goods, services, or facilities, within a specified area. ↩
8. We assume, but do not decide, that the special agency contract is a franchise within the broad definition of section 1253(b)(1)↩.
9. Present law.--The substantial growth of franchising throughout the United States in recent years has raised two significant problems: First, whether transfers of franchises are sales or licenses or, more particularly, whether the retention of powers, rights, or a continuing interest in the franchise agreement is significant enough to preclude a sale; and second, whether franchisors are selling franchises in the ordinary course of business. [H. Rept. No. 91-413 (Part 1), 91st Cong., 1st Sess. (1969), 1969-3 C. B. 200, 300.]
It is difficult to resolve under present law whether the transfer of a franchise, trademark, or trade name is to be treated as a sale or as a license, and whether the transferrors are selling franchises, trademarks, and trade names in the ordianry course of business. * * *[S. Rept. No. 91-552, 91st Cong., 1st Sess. (1969), 1969-3 C.B. 423↩, 554.]
10. SEC. 274. DISALLOWANCE OF CERTAIN ENTERTAINMENT, ETC., EXPENSES. * * *
(d) Substantiation Required. --No deduction shall be allowed-- * * *
(2) for any item with respect to an activity which is of a type generally considered to constitute entertainment, amusement, or recreation, or with respect to a facility used in connection with such an activity * * * * * *
unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating his own statement (A) the amount of such expense or other item, (B) the time and place of the travel, entertainment, amusement, recreation, or use of the facility, or the date and description of the gift, (C) the business purpose of the expense or other item and, (D) the business relationship to the taxpayer of persons entertained, using the facility, or receiving the gift. * * *↩
11. Petitioner's self-serving testimony as to the business purpose of such entertainment is uncorroborated except for the one occasion where Ray Brunkow, who testified in the instant case, was entertained. The business purpose of the boat usage is not evident from the circumstances of the entertainment. Sec. 1.274-5(c)(2)(ii)(b), Income Tax Regs.↩