**C. Rogler ELLIOTT and Martha Elliott, Plaintiffs-Appellants,**

**v.**

**UNITED STATES of America, Defendant-Appellee.**

**No. 39–70.**

United States Court of Appeals
Tenth Circuit.

Aug. 27, 1970.

Robert L. Jackson (John J. Ziegelmeyer, Kansas City, Kan., on the brief), for plaintiffs-appellants.

Anne E. Belanger, Atty., Dept. of Justice (Johnnie M. Walters, Asst. Atty. Gen., Lee A. Jackson and Elmer J. Kelsey, Attys., Dept. of Justice, and Robert J. Roth, U. S. Atty., of counsel, on the brief), for defendant-appellee.

Before PHILLIPS, BREITENSTEIN and HILL, Circuit Judges.

ORIE L. PHILLIPS, Circuit Judge.

In their joint income tax return for the year 1962, the Elliotts reported the receipt of $49,843 paid to C. Rogler Elliott,[1] as a long-term capital gain. The Commissioner of Internal Revenue held that such amount was taxable as ordinary income. On July 20, 1965, he issued the statutory notice of a deficiency in the amount of $14,900.90. On November 15, 1965, the Elliotts paid such amount, together with interest thereon, aggregating $17,187.47, to the District Director of Internal Revenue at Kansas City, Missouri. On April 5, 1966, they brought the instant action to recover such amount, on the ground it was erroneously assessed. From an adverse judgment, the Elliotts have appealed.

---

1. C. Rogler Elliott will hereinafter be referred to as Elliott.

The facts are not in dispute.

On January 15, 1957, Elliott entered into a General Agency contract with Postal Life and Casualty Insurance Company.[2] The territory covered by the General Agency contract was the area "in Missouri and Kansas within a radius of 150 miles of Kansas City, Missouri, and also the city of Kansas City, Missouri." The right to represent and solicit business for Postal was to be exclusive "within the corporate limits" of Kansas City, Missouri. "Outside of said corporate limits and within the said 150 mile radius," the General Agent's right to represent and solicit business for Postal was not exclusive, and in locations within such radius and outside of such corporate limits, where Postal had a soliciting agent, Elliott was not to establish a sub-agency without the consent of Postal.

The contract provided: That Postal "hereby appoints" Elliott "as its General Agent within" such territory; that Elliott, as General Agent, should "be free to exercise his own judgment as to the appointment of agents and brokers"; that Elliott should be authorized "to solicit and procure applications for life insurance, annuities, and accident and health insurance, * * * to deliver policies * * *, to make collections and remittances and perform such other acts" as Postal might require of him; that Elliott, "in conducting the business of the Agency," should "be governed strictly by all rules, regulations, and instructions contained in the manuals of instructions" of Postal, "or which he may receive from time to time" from it; that Postal reserved the right to solicit applications for and sell insurance in all of such territory through the United States mails, by direct circulation, or through magazine, newspaper, or radio advertising, and that commissions should be paid the General Agent only on policies issued through the direct efforts of him or sub-agents appointed by him; that the General Agent's contract was a

"personal contract" and should not be "transferrable without the consent of" Postal "in writing"; that it could "be terminated by the General Agent upon 30 days after the giving or mailing of written notice to" Postal; that it might be terminated by Postal "for cause upon 30 days after the giving or mailing of written notice to the General Agent"; and that "in any event" it should "terminate at the death of the General Agent," and that "during the continuance of this contract the General Agent" should "not become in any way connected with, or secure applications for, any other insurance company except where permission has been obtained from" Postal.

Thereafter, on January 15, 1957, Postal and Elliott entered into a supplemental contract, which provided that the General Agent "at his own expense" should "maintain an office and hire such employees as may be necessary for the transaction of the business of the Agency created by this contract"; that he should "pay and discharge all commissions, fees, rent, salaries and other expenses required in connection with the performance of this contract excepting only such as are specifically assumed by" Postal "hereunder"; that Postal should pay the "state licenses of" the "General Agent and" sub-agents appointed by him; "city licenses and occupational taxes of" the "General Agent"; "premium taxes levied and assessed against" Postal, and the cost of "such books, blanks, forms, stationery, manuals, sales and recruiting plans and material, and advertising as" Postal "ordinarily furnishes without charge to its General Agents."

It further provided that Postal should pay the General Agent for his services to be rendered under such contracts, "commissions on first-year and renewal premiums paid to" Postal "in cash on policies issued on applications produced" pursuant to such contract, by Elliott or the sub-agents appointed by him, as set forth to the extent here pertinent in note 3.[3]

---

2. Hereinafter called Postal.

3. See note 3 on page 1151.

3.

"Section C

\* \* \*

"Commissions Before Termination

(a) During the continuance of this contract

(1) First-year and renewal commission shown in the Schedule of Commissions.

(2) A collection fee of 2% of renewal premiums.

(3) From the amounts mentioned in Section C, (a), (1) above, the General Agent shall pay or allow each Sub-Agent in his Agency its first-year and renewal commissions in accordance with such Sub-Agent's contract with the General Agent. The General Agent shall file with the Company a copy of each Sub-Agent's contract.

(4) Expense allowances according to the Expense Allowance Supplement attached hereto.

"Commissions After Termination

(b) After termination of this contract

(1) First-year and renewal commissions shown in the Schedule of Commissions.

(2) From the amounts payable under Section C, (b), (1) immediately above, the Company shall deduct any amount it pays to the General Agent's Sub-Agents on business produced during the continuance of this contract.

"Section D

"(a) The following provisions shall be paramount to and shall control the provisions of Section C above and the following Schedule of Commissions.

"Schedule of Commissions

| | Commission in Policy Years | | | |
|---|---|---|---|---|
| LIFE | 1 | 2–4 | 5–10 | 11–15 |
| Premium Period | | | | |
| 25 or More Years | 90% | 15% | 10% | 5% |
| 20–24 Years | 85% | 15% | 10% | 5% |
| 15–19 Years | 80% | 12½% | 10% | 5% |
| 10–14 Years | 70% | 10% | 10% | 5% |
| ENDOWMENT & JUNIOR ESTATE | | | | |
| Endowment period | | | | |
| 35 or more years | 85% | 15% | 10% | 5% |
| 30–34 Years | 80% | 15% | 10% | 5% |
| 25–29 Years | 75% | 15% | 10% | 5% |
| 20–24 Years | 65% | 12½% | 10% | 5% |
| 15–19 Years | 60% | 10% | 10% | 5% |
| 10–14 Years | 55% | 10% | 10% | 5% |
| 5–9 Years | 50% | 10% | 10% | 5% |
| LIFE INCOME | | | | |
| Premium Period | | | | |
| 35 or More Years | 80% | 15% | 10% | 5% |
| 30–34 Years | 75% | 15% | 10% | 5% |
| 25–29 Years | 65% | 12½% | 10% | 5% |
| 20–24 Years | 60% | 10% | 10% | 5% |
| 15–19 Years | 55% | 10% | 10% | 5% |
| 10–14 Years | 50% | 10% | 10% | 5% |
| TERM, Mtge. Protection & Family Security Policies | | | | |
| Term Period | | | | |
| 25 or More Years | 90% | 10% | 10% | 5% |
| 20–24 Years | 85% | 15% | 10% | 5% |
| 15–19 Years | 75% | 12½% | 10% | 5% |
| 10–14 Years | 65% | 10% | 10% | 5% |
| 5–9 Years | 55% | 10% | 10% | 5% |
| SINGLE PREMIUM LIFE AND ENDOWMENT | 5% | – | – | – |
| SINGLE PREMIUM ANNUITY | 3½% | – | – | – " |

By a further supplemental contract, also dated January 15, 1957, the parties agreed that Postal should pay to the General Agent certain allowances as expenses for conducting such General Agency.

By an additional supplemental contract, entered into on January 15, 1957, Postal agreed to pay Elliott expenses incurred in training sub-agents, as specified in such supplemental contract.[4]

Elliott served Postal as General Agent under the General Agency contract in the territory indicated above until April 5, 1962.

During each of the years 1957 to 1961, inclusive, Elliott paid expenses incurred by him in operating the General Agency for Postal, amounts which aggregated $49,843.[5] He did not capitalize such expenses, but treated them as business expenses, and in his income tax returns for each of such years he deducted from his gross income as ordinary business expenses the amount of such expenses paid by him in the year covered by the return. He testified that he hoped to recoup the $49,843 by increased commissions earned by him as General Agent, under the General Agency contract with Postal, during the ensuing five years.

On April 5, 1962, Postal was merged with the Republic National Life Insurance Company of Dallas, Texas,[6] and a contract was entered into on that date between Republic and Elliott, whereby the General Agency contract of January 15, 1957, was cancelled and terminated, in consideration of Republic paying to Elliott $49,843.

The contract entered into between Elliott and Republic provided that the General Agency contract "shall be, and is hereby terminated."

It further provided that Republic agreed to pay to Elliott on business produced under the General Agency contract prior to its termination all unpaid first year commissions, to pay allowances defined as being 25 per cent of first year life premiums on policies "heretofore written and issued," and also to pay a recruiting bonus equivalent to 20 per cent of the first year life premiums "only on business heretofore written and issued" by three named sub-agents.

It further provided that Republic should pay to Elliott an amount equal to all the gross renewal commissions provided for under Elliott's General Agency contract with Postal on business produced under such General Agency contract "prior to its termination hereby, upon the same basis as though" such General Agency contract and the contracts with the sub-agents "had not been terminated."

It further provided that Elliott should "pay in cash the total indebtedness of all" the sub-agents "currently under contract with [the] General Agent or with Postal" or with both in the aggregate amount of $15,843.

It further provided that Elliott agreed, upon request by Republic, immediately to recommend in writing to the sub-agents that they enter into Agency contracts with Republic to continue for a period not to exceed three months to represent Republic in the servicing of all Postal policyholders, and that Elliott should do everything possible to conserve existing Postal business.

It further provided that for a period of 90 days from the effective date of the merger of Postal and Republic, Republic should pay to Elliott as Agency expense and General Agent's compensation $3,-000 per month.

Thus, it will be seen that Elliott retained all unpaid gross commissions on first year premiums and commissions on renewal premiums on all insurance business that had been written through the General Agency prior to the termination of the General Agency contract upon

---

4. The original contract and contracts supplemental thereto will hereinafter be referred to as the General Agency contract.

5. Such expenses were in addition to those paid by Postal and expenses for which it was to reimburse Elliott if paid by him.

6. Hereinafter called Republic.

the same basis as if such contract had not been terminated.

The contract with Republic further provided that Republic should "pay immediately in cash, to" Elliott "$49,843.00 personal money invested by" Elliott "in the building of his Agency under" the General Agency "contract with Postal."

However, the record clearly shows that the $49,843 was not invested by Elliott, but was General Agency expense, which Elliott agreed in the General Agency contract to pay, in addition to the expenses which Postal agreed to pay or assume.

Elliott did not endeavor to capitalize such amount, but at all times treated it as business expenses incurred and paid by him in the operation of the General Agency during the first five years, and as above stated, in his income tax returns for each of such five years, he deducted from his gross income as ordinary business expenses the amount of such expenses paid by him in the year covered by the return.

True, he testified he expected to recoup such expenses paid by him in the second five-year term of his service under the General Agency contract. Had he served a second five years under the General Agency contract and earned in such second five-year period net income that exceeded his net income during the first five-year period in the amount of $49,843 or more, all of such excess income, less proper deductions, would have been taxable as ordinary income.

Hence, what Elliott gave in return for the $49,843 paid to him by Republic was the release of Postal's obligation to him under the General Agency contract, except as to commissions on first year premiums and commissions on renewal premiums on policies written under the General Agency contract before April 5, 1962, with respect to which such contract remained in force and effect, and which were assumed by Republic. What he lost by such release was the right to serve as General Agent and earn additional commissions in the future. Such release, or cancellation, except as to commissions already earned, not only ended Postal's and Republic's obligation to Elliott, but also ended, except as to earned commissions, all of Elliott's rights under the General Agency contract with Postal. Elliott's rights under the General Agency contract were not transferred either to Postal or to Republic. They simply came to an end.[7]

In short, what Elliott relinquished under his agreement to terminate the General Agency contract, except for commissions already earned, was the right to serve Postal and its successor, Republic, personally and through the sub-agents, and to earn commissions on first year premiums and renewal premiums on contracts of insurance written after April 5, 1962; and any consideration that he received from Republic for his right so to continue and to earn commissions was not compensation for a transfer of the General Agency, but for loss of future earnings.

All books of account, letters, documents, or other materials related to the General Agency business were delivered to Republic, as successor of Postal, but they were always the property of Postal and its successor and were delivered to Republic in accordance with the terms of the General Agency contract.

While Elliott turned over the files and records which were not personal to him to Republic, he did not turn over his list of potential insurance customers.

During the first two years of the General Agency contract with Postal, Elliott conducted the General Agency in rented quarters. He then built an office building with 5,400 square feet of office space on two floors in Kansas City, Missouri, and as General Agent occupied the ground floor of the building. He personally paid for a large sign on the front of the building, reading: "Postal Life and Casualty Insurance Agency, C. Rogler Elliott, General Agent." He retained the sign.

7. Commissioner of Internal Revenue v. Starr Bros., Inc., 2 Cir., 204 F.2d 673, 674.

Whatever good will Elliott built up for Postal as an insurance company, while acting as its General Agent, resulted from his services as such Agent and belonged to Postal. Whatever good will or business reputation he built up for himself as a General Agent or as an insurance agent while he served Postal under the General Agency contract, he retained.

■ A sale of good will, for tax purposes, takes place " ' * * * only when the business or a part of it, to which the goodwill attaches is sold * * *.' " [8] Here, there was no sale of the General Agency or the General Agency contract.

■ In short, what Elliott relinquished was the right to render services of a personal nature, as the General Agent of Postal, and to earn commissions and compensation for such services in the future. Such commissions, had they been earned, would have constituted ordinary income. A lump sum paid for the surrender of the right to render such services and earn such commissions constituted ordinary income. [9]

If the case of Jones v. Corbyn, decided by this court in 1950, 186 F.2d 450, stood today as the law of this circuit, unqualified or unmodified, it would afford strong support for the contention of the Elliotts, but it has not so stood. The Second Circuit, in a decision rendered in 1953, Commissioner of Internal Revenue v. Starr Bros., Inc., 2 Cir., 204 F.2d 673, at 674, refused to follow Jones v. Corbyn, particularly on the ground that a release and cancellation of a general agency insurance contract did not amount to a sale and transfer of a capital asset, as had been held by this court in Jones v. Corbyn.

In the 1966 Revision of Volume 3B of Mertens Law of Federal Income Taxation, Ch. 22, § 22.34, pp. 227–234, the author states, at page 228, that the holding of this court in Jones v. Corbyn is "in large measure a departure, however, from the general principle governing sale of the proceeds from future services."

Jones v. Corbyn was likewise criticized by the Fifth Circuit in Bisbee-Baldwin Corporation v. Tomlinson, 5 Cir., 320 F.2d 929, 933, where it approved the above quotation from Mertens and said that our holding in Jones v. Corbyn had been expressly disapproved, and, in effect, overruled by the case of Wiseman v. Halliburton Oil Well Cementing Company, 10 Cir. (1962), 301 F.2d 654. In Halliburton, this court, sitting en banc, handed down an opinion by the author of the opinion in Jones v. Corbyn. In Halliburton, Stanolind Oil and Gas Company had "granted to Halliburton the right to develop and use commercially, under the trade name 'Hydrafrac Process,' an unproven method, known as hydraulic fracturing, which it had invented for the creation and stimulation of production from oil and gas wells. Except for use by Stanolind and its affiliates, the agreement granted to Halliburton" an exclusive and "nontransferable right to use" such process "in the United States and foreign countries and, subject to the approval of Stanolind, to issue sublicenses to others" to use it. "Halliburton agreed to pay Stanolind a $100 royalty for each Hydrafrac job performed by Halliburton, its affiliates or sublicensees."

"At the time of the execution of the agreement, the process was in its experimental stages and had not been commercially developed and tested in the field. Under the terms of the agreement both

8. Treas.Reg. 111, § 29.22(a)–(10) ; 3B Mertens, Law of Federal Income Taxation, 1966 Revision, Ch. 22, § 22.50, p. 305 ; Commissioner of Internal Revenue v. Chatsworth Stations, Inc., 2 Cir., 282 F.2d 132, 136 ; Webster Investors, Inc. v. Commissioner of Internal Revenue, 2 Cir., 291 F.2d 192, 195.

9. Wiseman v. Halliburton Oil Well Cementing Company, 10 Cir. (1962), 301 F.2d 654 ; Bisbee-Baldwin Corporation v. Tomlinson, 5 Cir., 320 F.2d 929, 933 ; Commissioner of Internal Revenue v. Starr Bros., Inc., 2 Cir., 204 F.2d 673, 674 ; Hort v. Commissioner of Internal Revenue, 313 U.S. 28, 31, 61 S.Ct. 757, 85 L.Ed. 1168.

Stanolind and Halliburton were to continue the development and improvement of the process, and Halliburton was to promote its use in the industry. Each party agreed to furnish the other with technical information and data" acquired by it "which would be of assistance to the other. The agreement was to remain in effect until the expiration of any patents issued to Stanolind relating to the process. Halliburton immediately entered into extensive laboratory work, developed special mechanical equipment, trained personnel, and devised safety methods." After the process was perfected, "the demand of the oil and gas industry for use of the process exceeded all expectations," and the "demand became so great that Halliburton was unable to manufacture equipment and train personnel sufficient to meet the requests for the service." That situation brought about "a growing demand among Halliburton's * * * servicing competitors for a right to use the process. Halliburton doubted that it would be good business practice for it to license its own competitors * * *. The situation became acute in 1952," and the parties discussed the modification of Halliburton's contract with Stanolind. As a result, an agreement was entered into on June 10, 1953. By such agreement, "Halliburton terminated its right to an exclusive license under the 1949 agreement and accepted a non-exclusive license." It was mutually "agreed that Stanolind should have the irrevocable right to supply other licensees with the technical information and data relating to the use of the process which had previously been available only to Stanolind from Halliburton." The agreement fur-

ther provided that Halliburton should "receive a sum equivalent to one-third of the royalties which Stanolind received from licenses granted to third parties."

In the year 1955, the tax year in question in that case, one-third of the royalties received by Stanolind amounted to in excess of $400,000. Halliburton reported the sum received from Stanolind "as proceeds from the sale or exchange of a capital asset. The Commissioner" of Internal Revenue "determined that" such receipts should have been "treated as ordinary income, and assessed a deficiency." Halliburton paid the deficiency and filed a claim for refund, which was denied. This court, in sustaining the deficiency and holding that the amount received by Halliburton under the new contract was ordinary income, stated that the holding in Jones v. Corbyn was "premised in part upon broad reasoning which seemingly conflicts with the views expressed in the case at bar. To the extent such conflict may exist, we now rely upon the views herein expressed." [10]

It is settled law that since § 117 of the Internal Revenue Code of 1954 (68A Stat. 321, 26 U.S.C.A. § 1221) "is an exception from the normal tax requirements of the Internal Revenue Code, the definition" therein "of a capital asset must be narrowly applied" and the exclusions therein from the general definition of a capital asset "interpreted broadly" in order "to effectuate the basic congressional purpose." Corn Products Refining Company v. Commissioner of Internal Revenue, 350 U.S. 46, 52, 76 S.Ct. 20, 24, 100 L.Ed. 29.[11]

We conclude that the General Agency was not transferred, but simply came to

10. In Mansfield Journal Co. v. Commissioner of Internal Revenue, 31 T.C. 902, 910, the Tax Court said:
    "Petitioner relies on Commissioner v. Covington [5 Cir.], 120 F.2d 768, and Jones v. Corbyn, 186 F.2d 450. The doctrine of these cases has been overruled by *Corn Products Refining Co.* * * *"
    Mansfield was affirmed by the Court of Appeals in Mansfield Journal Co. v.

    Commissioner of Internal Revenue, 6 Cir., 274 F.2d 284.
    See also: 3B Mertens, Law of Federal Income Taxation, 1966 Revision, Ch. 22, § 22.34, pp. 227–234.

11. See also: Hort v. Commissioner of Internal Revenue, 313 U.S. 28, 31, 61 S.Ct. 757, 85 L.Ed. 1168; Kieselbach v. Commissioner of Internal Revenue, 317 U.S. 399, 403, 63 S.Ct. 303, 87 L.Ed. 358.

an end on April 5, 1962; that the General Agency contract was not transferred, but was cancelled and terminated on April 5, 1962, except as to commissions on first year premiums and on renewal premiums on insurance written prior to that date, as to which it remained in effect; that the only property turned over to Republic by Elliott was property that belonged to Postal prior to the merger; that the only thing that Elliott relinquished by his contract with Republic was the right to continue to serve as General Agent under the General Agency contract after April 5, 1962, and to earn commissions on first year premiums and commissions on renewal premiums on policies issued after that date; and that the $49,843 was paid to Elliott by Republic to reimburse him for the loss of future earnings and was taxable as ordinary income.

Accordingly, the judgment is affirmed.