**Paul T. VAALER, Individually, and as Special Administrator of the Estate of Thelma T. Vaaler, Deceased, Appellees.**

v.

**UNITED STATES of America, Appellant.**

No. 71–1134.

United States Court of Appeals,
Eighth Circuit.

Jan. 21, 1972.

Richard Halberstein, Atty., Tax Div., Dept. of Justice, Washington, D. C., Johnnie M. Walters, Asst. Atty. Gen., Meyer Rothwacks, Bennet N. Hollander, Attys., Tax Div., Dept. of Justice, Washington, D. C., for appellant; Harold O. Bullis, U. S. Atty., of counsel.

Robert Vaaler, Stokes, Vaaler, Gillig, Warcup & Woutat, Grand Forks, N. D., for plaintiffs-appellees.

Before MATTHES and LAY, Circuit Judges, and HUNTER, District Judge.

ELMO B. HUNTER, District Judge.

Presented on this appeal is the single question of whether $13,861.20 received by taxpayer-appellant, Paul T. Vaaler,[1] from Sunshine Mutual Insurance Company upon termination of his general agency contract was gain received from the sale of a capital asset or ordinary income. The District Court held it was a capital asset sale, and entered judgment accordingly.

On March 1, 1947, Vaaler entered into a written contract with Sunshine in which he agreed to act as a general agent for Sunshine for approximately seventy-five percent of the State of North Dakota for which he was to be paid a five percent commission on net premiums written by all agents within the specified territory. The contract further provided Vaaler was to supervise and assist the present local agents, appoint new agents and close out agents not considered desirable by Sunshine. He was to pay his own expenses. In the contract it is stated that Sunshine was interested only in the results accomplished by Vaaler in providing more fire, extended coverage, wind and automobile insurance business in North Dakota, and that Sunshine was to have no control over his actions. He was specified to be an independent contractor and not an agent of Sunshine.

The contract provided that it "may be terminated at any time by giving 60 days written notice to the other party, or in case of the death of the agent. In the event of such termination of this contract the company shall have the first option to purchase from the agent or his estate all of his claims, interests and rights in policies in force in his territory on the date of termination and any renewals thereof for the sole consideration of five % on the increase in net premium volume from the date of this contract to the date of termination." The contract further specified that the basis for determining this increase would be on the assumption that there was $75,000 in net premiums written in Vaaler's territory during the twelve months prior to the contract date, and the $75,000 figure was to be compared with the actual net premium written during the twelve months immediately preceding the date of termination.

For approximately fourteen years Vaaler served as General Agent for Sunshine under the contract. During that time he appointed in excess of 148 agents for Sunshine and terminated a substantial number. On December 24, 1960, the contract was terminated by Sunshine effective February 28, 1961. Sunshine advised it was exercising its "option to purchase from the agent or his estate all his claims, interests and rights in policies in force in his territory on the date of termination and any renewals thereof."

The parties eventually determined that $13,861.20 was the amount owed under the contract, and on May 23, 1961, Sunshine paid that amount to Vaaler. The Commissioner of Internal Revenue viewed the payment as receipt of ordinary income rather than as a capital gain. After paying the resultant tax under protest, Vaaler filed suit for tax refund.

The pertinent statutory provision is contained in Section 1221 of the Internal Revenue Code of 1954 (26 U.S.C. § 1221). That section defines the term "capital asset" to mean property held by

---

1. The estate of Thelma T. Vaaler, deceased, is a technical party also.

the taxpayer, subject to certain named exclusions.

■ Over the years considerable case law has evolved to further illuminate the meaning of the term "capital asset." [2] In Commissioner of Internal Revenue v. Gillette Motor Transport, 364 U.S. 130, at 133, 80 S.Ct. 1497, at 1500, 4 L. Ed.2d 1617, at 1621, Mr. Justice Harlan writing for the Court said, "While a capital asset is defined in § 117(a) (1) as 'property held by the taxpayer,' it is evident that not everything which can be called property in the ordinary sense and which is outside the statutory exclusions qualifies as a capital asset. This Court has long held that the term "capital asset" is to be construed narrowly in accordance with the purpose of Congress to afford capital-gains treatment only in situations typically involving the realization of appreciation in value accrued over a substantial period of time, and thus to ameliorate the hardship of taxation of the entire gain in one year. Burnet v. Harmel, 287 U.S. 103, 106, 53 S.Ct. 74, 75, 77 L.Ed. 199. Thus the Court has held that an unexpired lease, Hort v. Commissioner, 313 U.S. 28, 61 S.Ct. 757, 85 L.Ed. 1168, corn futures, Corn Products Ref. Co. v. Commissioner, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29, and oil payment rights, Commissioner of Internal Revenue v. P. G. Lake, Inc., 356 U.S. 260, 78 S.Ct. 691, 2 L.Ed.2d 743, are not capital assets even though they are concededly 'property' interests in the ordinary sense." And, as stated in C.I.R. v. Ferrer, 304 F.2d 125, 129 (2 Cir. 1962), "Section 117(a) of the 1939 Code, now § 1221 of the 1954 Code, 26 U.S.C.A. § 1221, tells us, not very illuminatingly, that 'capital asset' means property held by the taxpayer (whether or not connected with his trade or business), but does not include four (now five) types of property therein defined. However it has long been settled that a taxpayer does not bring himself within the capital gains provision merely by fulfilling the simple syllogism that a contract normally constitutes 'property,' that he held a contract, and that his contract does not fall within a specified exclusion, C.I.R. v. Gillette Motor Transport, 364 U. S. 130, 134–135, 80 S.Ct. 1497, 4 L.Ed.2d 1617 (1960); Surrey, Definitional Problems in Capital Gains Taxation, 69 Harv.L.Rev. 985, 988 (1956). This is easy enough; what is difficult, perhaps impossible, is to frame a positive definition of universal validity."

Even so, some helpful insight into the question is obtainable from the decisions in comparable or adjacent areas to that presently before us. In Commissioner of Internal Revenue v. P. G. Lake, Inc., 356 U.S. 260, at 266, 78 S.Ct. 691, at 695, 2 L.Ed.2d 743, at 749, concerning oil payment assignment situations, Mr. Justice Douglas speaking for the Court declared, "The substance of what was assigned was the right to receive future income. * * * In short, consideration was paid for the right to receive future income, not for an increase in the value of the income 11-11 producing property," and held the money so paid to be ordinary income.

Further review of the cases reveals that the courts have quite uniformly held that contracts for the performance of personal services are not capital assets and that the proceeds from their transfer or termination will not be accorded capital gains treatment but will be considered to be ordinary income.[3]

2. It was further noted in *Gillette*, loc. cit. 364 U.S. 133, 80 S.Ct. 1500, 4 L.Ed.2d 1620, that: "(1) There must be first a 'capital asset', and second, a 'sale or exchange' of that asset . . . and (3) for the purpose of calculating gain, the cost or other basis of the property must be subtracted from the amount realized on the sale or exchange."

3. General Artists Corp. v. Commissioner, 205 F.2d 360 (2 Cir. 1953); Maryland Coal and Coke Co. v. McGinnes, 350 F.2d 293 (3 Cir. 1965); Gordon v. Commissioner, 262 F.2d 413 (5 Cir. 1958); Lozoff v. United States, 266 F.Supp. 966, 970 (E.D.Wis.1967).

So also is a lump sum payment in consideration of a right to receive income in the future generally treated as ordinary income rather than as a capital gain.[4]

To dispose of the question before us it is necessary to determine as exactly as possible what property, if any, was sold or exchanged.[5] As we view it, what Vaaler relinquished in return for the $13,861.20 was the right to render personal services as general agent of Sunshine and to earn a five percent override on all policies sold in the territory. His right under the contract to future commissions (earnings) thereby came to an end. Such commissions had they been earned would have constituted ordinary income. Thus, we hold that the lump sum paid for the extinguishment of the right to render such services and to earn such commissions constituted ordinary income.

Vaaler testified that over the 14 year period he built up an "agency plant" and it is for this "agency plant" that Sunshine received compensation. The short answer is that Vaaler transferred nothing to Sunshine. On February 28, 1961, his services as general agent came to an end. The General Agency contract was not sold or exchanged but was cancelled, and terminated on February 28, 1961. The local agents Vaaler had obtained for Sunshine remained, as before, local agents of Sunshine. No files, papers, ledgers, customer lists, furniture, office equipment or records of any kind were sold or transferred. In fact, Vaaler had no records other than a duplicate of one that Sunshine maintained.

Vaaler's counsel cites a number of cases to support his view that the transaction was of a capital gains nature. However, these cases are readily distinguishable, and, as a group serve to illustrate that on the precise facts before us, ordinary income rather than capital gain resulted from the transaction. For example, in C.I.R. v. Killian, 314 F.2d 852 (5 Cir. 1963) payment to the taxpayer in connection with the sale and dissolution of an insurance partnership was to a substantial extent for his customer's lists. In Nelson Weaver Realty Company v. Commissioner, 307 F.2d 897 (5 Cir. 1962) the sale included the transfer of the complete files, ledger cards and all papers pertaining to the mortgages.

Nor can it be said that Vaaler's contract termination resulted in a transfer of good will to Sunshine. As stated in Elliott v. United States, 431 F.2d 1149 at 1154 (10 C.A.1970), "A sale of good will for tax purposes, takes place * * * only when the business or a part of it, to which the good will attaches is sold . . .."[6] As in *Elliott*, whatever good will the general agent (Vaaler) built up for the insurance company, while acting as its general agent, resulted from his services as such agent and belongs to the insurance company. Whatever good will or business reputation he built up for himself as a general agent or as an insurance agent while he served the insurance company under the general agency contract, he retained.

For the reasons given, the judgment below is reversed.

4. Commissioner of Internal Revenue v. P. G. Lake, Inc., 356 U.S. 260, 78 S.Ct. 691, 2 L.Ed.2d 743 (1958) ; Hort v. Commissioner, 313 U.S. 28, 61 S.Ct. 757, 85 L.Ed. 1168 (1941) ; Helvering v. Horst, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75 (1940) ; Holt v. Commissioner, 303 F.2d 687 (9 Cir., 1962).

5. See footnote 2, page 1122.

6. Normally, good will does not exist apart from a going concern. 33 Am.Jur.2d § 2356, page 577 ; Comment, An Inquiry Into the Nature of Good Will, 53 Col.L. Rev. 660 (1953) ; R. McDonald, Good Will and the Federal Income Tax, 45 Va. L.Rev. 645 (1959).