GEORGE J. ROCKSON and RUTH U. ROCKSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Rockson v. Commissioner
Docket No. 3769-74.
United States Tax Court
T.C. Memo 1976-288; 1976 Tax Ct. Memo LEXIS 116; 35 T.C.M. (CCH) 1286; T.C.M. (RIA) 760288; September 9, 1976, Filed J. C. DeDobbeleer, for the petitioners. Peter Bakutes, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined a deficiency of $2,568.54 in petitioners' 1971 Federal income tax. The issue for decision is whether a lump sum payment received by petitioner George J. Rockson from his employer was paid for the release of petitioner's rights under an employment agreement *117 or for the release of his rights under a contingent share agreement. FINDINGS OF FACT Some of the facts have been stipulated and are so found. At the time they filed their petition, petitioners resided in Menlo Park, California. Ruth U. Rockson is a party solely by virtue of having filed a joint income tax return with her husband, and George J. Rockson will be referred to herein as petitioner. Petitioner was born in 1922 and studied primarily business and marketing while in college. After graduation petitioner worked as a management consultant, initially with a New York consulting firm. He later opened his own office. His work involved developing marketing programs for small companies. In 1966 and 1967 petitioner did consulting work for Bonanza Industries ("Bonanza"). Bonanza was a manufacturer of recreational vehicles, primarily mini-bikes, mini-boats, and mini-dune buggies. In July 1967 Bonanza was incorporated in California, and petitioner became its secretary-treasurer. By 1969 he and two other individuals, Ottis W. Waters, Jr. and Michael O. Farrand, were the sole shareholders in Bonanza. By 1969, Bell Electronic Corporation ("Bell") became interested in *118 acquiring Bonanza. Negotiations between Bell and Bonanza's three shareholders resulted in Bell's acquisition of the stock of Bonanza. The final understanding between the parties was expressed in a number of agreements: an acquisition agreement, a subsequent amendment to that agreement, an employment agreement between petitioner and Bonanza, and a contingent share agreement. Petitioner played only a limited role in negotiating these agreements. He had no prior legal training and was not involved in the actual negotiations with Bell. He did, however, work with Bonanza's counsel, a Mr. Fred W. DeKlotz, Jr., in the determination of the details of the acquisition agreement before signing it, and even suggested some changes of language in the agreement. Petitioner also reviewed the amendment to the acquisition agreement and the employment agreement with DeKlotz. Petitioner discussed the entire series of agreements with the other Bonanza shareholders, Waters and Farrand. On April 18, 1969, Bell and petitioner, Waters, and Farrand signed the acquisition agreement. This agreement provided that the three individuals would transfer their Bonanza shares to Bell. In return Bell would *119 transfer 60,000 shares of Bell common stock, of which petitioner would himself receive 4,800 shares. The acquisition agreement, in section 11, contained petitioner's covenant that he would not be involved in the manufacture or sale of mini-karts, mini-bikes, or sandbuggies within certain specified areas of the continental United States for a five-year period. The acquisition agreement served as the coordinating document for the entire transaction. In it the parties further agreed that Bell would subsequently execute a contingent share agreement and that Bell and Bonanza would enter into an employment agreement with Rockson. During May, 1969, all of the outstanding shares of common stock of Bonanza were transferred by the three Bonanza shareholders to Bell. Bell continued Bonanza in existence as a wholly-owned subsidiary. On June 18, 1969 the parties agreed to amend the acquisition agreement. By this time Bell had had its accounting firm conduct an audit and had concluded that Bonanza's current value was less than previously estimated. In the amendment, the parties agreed to reduce the number of Bell shares which the Bonanza shareholders would immediately receive from *120 60,000 to 40,000, thereby reducing petitioner's interest from 4,800 to 3,200 shares. They further agreed to increase the ceiling in the contingent share agreement from 260,000 to 280,000 shares of Bell common stock. Soon thereafter, on June 26, 1969, petitioner and Bonanza entered into an employment agreement. In this document Bonanza agreed to hire petitioner in an executive capacity for three years at a salary of $22,000 each year. Bonanza retained the right to terminate petitioner's employment for "cause," in which case Bonanza's obligation to pay petitioner would end. However, if Bonanza terminated petitioner's employment "without cause," it agreed to continue to pay petitioner the amount he would have otherwise received as salary for the unexpired portion of the three-year term of the agreement. The agreement also provided that petitioner would be elected to Bonanza's Board of Directors. On the same day that petitioner and Bonanza entered into their employment agreement, Bell and Waters, Farrand, and petitioner signed the contingent share agreement. Under this agreement, the three former Bonanza shareholders would receive up to 280,000 additional shares of Bell common *121 stock, the exact number of shares to be determined on the basis of one share for each $3.08 of Bonanza's net income in excess of $400,000 during the period April 1, 1969 to June 30, 1972. Bell, in the contingent share agreement, pledged its best efforts to supply or otherwise provide Bonanza with needed working capital. An undated memorandum, signed by Bell, Waters, Farrand, and petitioner, estimated Bonanza's current need for working capital at $416,000 and its future need at approximately 15 percent of annual gross sales. As time progressed, Bell grew increasingly dissatisfied with the cost side of Bonanza's operations. In June 1970, Bell assigned Mr. Marsden Lytle, an assistant to Bell's president, the task of reviewing management decisions at Bonanza, including Bonanza's excessive investment in inventory. On the surface Bonanza appeared to be operating profitably. Its profit and loss statement for the year ending June 30, 1970, showed a profit of approximately $150,000. However, after necessary adjustments were made by Bell's independent accountants, it turned out that Bonanza was only marginally profitable. Furthermore, if Bell had charged interest on funds it advanced *122 Bonanza, Bonanza would have shown a loss. By November 1970, it appeared unlikely that Bonanza would show any profit for the thirty-nine month period from April 1, 1969 to June 30, 1972. Bell's dissatisfaction gradually crystallized, and on Friday, November 13, 1970, Lytle, acting for Bell, asked petitioner to resign from both of his positions with Bonanza. Petitioner refused, and, at a special meeting of Bonanza shareholders held on December 15, petitioner was dismissed from Bonanza's Board of Directors. During the remainder of November and December, petitioner negotiated with Lytle concerning termination of his remaining connections with Bonanza. Initially Bell offered petitioner only $10,000 for cancellation of the employment agreement and the contingent share agreement. Petitioner's initial demand was for $24,091.54. Later, after realizing that Bonanza still owed him $1,390.02 for accrued salary and for unreimbursed travel expenses, petitioner increased his demand to $25,416.00. This amount was the final settlement figure. The principal issues dividing the parties in November and December revolved around the value of petitioner's rights under the employment agreement, *123 the scope of a covenant not to compete, and the time schedule under which Bell would pay out the settlement figure to petitioner. In the negotiations petitioner consistently took the position that, if the restrictive covenant were removed from the agreement, he would want no compensation under the employment agreement. To the degree, however, he was barred from seeking new employment, petitioner desired compensation. Nothing in the agreement was important to petitioner except the terms of the covenant and the pay-out schedule.
Throughout these negotiations petitioner stressed that he might initiate suit over the various agreements, including the contingent share agreement. For this and other reasons, some degree of antagonism marked the relations between the parties. Although there was some discussion between petitioner and Bell about allocating the final settlement figure between the employment agreement and the contingent share agreement, the parties reached no understanding concerning any type of allocation. In fact, Bell felt, as of December 1970, that petitioner's rights under the contingent share agreement were worth next to nothing. Bell contemplated that the settlement *124 figure would be paid primarily for the petitioner's rights under the employment agreement. Bell, however, factored in an additional amount to reflect the costs it might otherwise have to bear to defend a suit on the contingent share agreement. After the December 15, 1971 special Bonanza shareholders' meeting at which petitioner was dismissed from Bonanza's Board, petitioner consulted with Bonanza's counsel, Mr. DeKlotz, instructing DeKlotz to allow three weeks to attempt to obtain a settlement with Bell but, if unsuccessful, to then sue. DeKlotz at some point thereafter recommended that petitioner obtain a new attorney to handle his possible law suits against Bell or Bonanza. Petitioner contacted a Mr. Peter Townsend on January 10, 1971, and gave him instructions similar to those he had given DeKlotz. Petitioner received no advice from Townsend or any other attorney concerning possible allocation of the settlement figure between the employment agreement and the contingent share agreement. Townsend negotiated with Bell's attorney over only a limited number of issues. These involved the expiration date of the covenant not to compete, the time schedule under which petitioner *125 would be paid the settlement amount, and petitioner's obligation not to reveal any confidential information. Townsend undertook no negotiations with Bell with respect to the amount of the settlement figure or the allocation of that amount between the employment agreement and the contingent share agreement. After several negotiating sessions, Townsend succeeded in reaching an agreement with Bell concerning the conditions for petitioner's departure. The original draft of the document embodying the termination agreement between Bell, Bonanza, and petitioner was produced by Bell's attorneys. Before the agreement was signed, it underwent several revisions. Petitioner was aware of many of these revisions. Townsend also reviewed the document and made some additional changes. Petitioner first obtained a copy of the final draft of the termination agreement on January 15, 1971. He received a copy from Townsend late in the afternoon of the 15th, drove over forty miles to the scene of the signing, signed the document apparently without having ever read the final version of the agreement, and received his check. At that time he was in great need of funds, and he could not sell or pledge *126 his only major asset, his Bell stock. The termination agreement provided, interalia, : 1. (a) The Employment Agreement is terminated as of December 15, 1970 and Bonanza shall not be obligated to employ Rockson and Rockson shall not be obligated to serve Bonanza from and after said date… (b) The parties agree that the present value of Rockson's future compensation under the Employment Agreement reduced by the value to Rockson of release therefrom would be, and Bonanza shall, subject to the conditions set forth below, pay to Rockson in consideration of cancellation of the Employment Agreement, the total sum of Twenty-Five Thousand, Four Hundred Sixteen Dollars ($25,416) as follows: (i) Fifty percent thereof shall be paid concurrently with the signature of this agreement by all persons whose signatures are to be appended hereto; (ii) * * * the remaining fifty percent thereof shall be paid on June 1, 1971 * * *
(2) Rockson hereby releases Bell, without new consideration, from its obligation to issue shares of Common Stock of Bell to Rockson pursuant to the Contingent Share Agreement; and it is agreed that shares which might otherwise become issuable to Rockson *127 pursuant to the Contingent Share Agreement but for the provisions of this agreement, shall not be issued to Rockson or anyone else. In addition, section 4 of the termination agreement continued by reference the covenant not to compete which was contained in section 11 of the acquisition agreement. Petitioner was unaware that sections 1(b) and 2, which specified the parties' agreement concerning the allocation of the lump sum, were in the termination agreement, apparently due to his failure to have read the final version of the document. On their joint 1971 Federal income tax return, petitioner and his wife reported the $25,416.00 received from Bell pursuant to the termination agreement as longterm capital gain. Their label for this entry was "Settlement of Employment Agreement with contract to acquire ownership interest in Employer Corp." In his notice of deficiency respondent determined that the entire amount received by petitioner was paid by Bell for petitioner's cancellation of the employment agreement and was therefore taxable as ordinary income. OPINION The sole issue we must decide is whether part or all of the $24,026 [1] paid petitioner in two installments upon *128 his leaving the employment of Bell Electronic Corporation in 1969 was paid for release of his rights under a contingent share agreement rather than for release of his rights under his employment agreement with Bell. We conclude that the entire amount was paid for release of his rights under the employment agreement and was therefore ordinary income. Vaaler v. United States,454 F. 2d 1120, 1122-1123 (8th Cir. 1972); Nat Holt,35 T.C. 588, 599-600 (1961), affd. 303 F. 2d 687 (9th Cir. 1962); David L. Gordon,29 T.C. 510, 513 (1957), affd. 262 F. 2d 413 (5th Cir. 1958); F. W. Jessop,16 T.C. 491, 498 (1951). Petitioner argues that, although the express language of the termination agreement allocates *129 the entire settlement amount to release of his employment rights, in reality the parties allocated the bulk of that sum to release of his rights under the contingent share agreement. We do not agree. Petitioner does not deny that he was a party to the termination agreement. He does not deny that, during the negotiations which led to the termination agreement, he and Bell possessed adverse tax interests, and we independently conclude that the parties' interests did conflict. It was in petitioner's interest to allocate the settlement figure entirely to the contingent share agreement, so that he could characterize the payment as capital. Bell, on the other hand, would wish the settlement sum to be completely assigned to the employment agreement, so that it could deduct the payment as an ordinary and necessary business expense. In such a situation of tax adverseness, we will overlook the express wording of a written agreement only if petitioner produces strong proof. Schulz v. Commissioner,294 F. 2d 52, 55 (9th Cir. 1961), affg. 34 T.C. 235 (1960); Ullman v. Commissioner,264 F. 2d 305, 308 (2nd Cir. 1959), affg. 29 T.C. 129 (1957). *130 Petitioner has failed to produce strong proof. His main argument is that he based his settlement demand to Bell upon a formula which looked only to the contingent share agreement. Petitioner alleges that his formula had four steps. He claims that he first determined the maximum number of shares he was eligible to receive under the contingent share agreement. He then calculated the amount of time which had passed under the contingent share agreement as a percentage of the total thirty-nine month time span of the agreement. After that, he asserts that he determined the then current market value of Bell common stock. He lastly multiplied the first two figures together and then multiplied their result by the third figure to produce the $25,461 figure used in the termination agreement. We conclude that there is simply no evidence in the record showing that the parties actually employed this purported formula. Quite the contrary. Lytle's testimony, which we found credible, indicates that the formula played no role whatsoever in Bell's decision of how much to offer petitioner. Further, petitioner does not make any attempt to harmonize his purported formula with Bonanza's unsatisfactory *131 operating performance. This performance and the steps necessary to remedy it, such as securing new management, were the factors motivating Bell in these negotiations. We find it difficult to believe that even petitioner employed this formula. His formula bore little or no relation to the economic substance of the negotiations. The economic strength of petitioner's bargaining position vis-a-vis Bell consisted in his right under the employment agreement to be employed by Bonanza for another eighteen months, limited only by the possibility of being dismissed for "cause". His rights under the contingent share agreement, on the other hand, were totally dependent upon the financial success of Bonanza which, at the time of separation, appeared anything but promising. Perhaps Bonanza's poor outlook was partly a function of Bell's unwillingness to meet Bonanza's working capital needs. But since Bell had no contractual obligation to advance funds, Bell's disinclination would not have given rise to a colorable lawsuit over the contingent share agreement. It therefore appears very unlikely that petitioner would have based his bargaining position solely on his estimate of the present value *132 of his prospects under the contingent share agreement and include nothing for his rights under the employment agreement. In addition to his formula argument, petitioner also advances several duress-type contentions in support of his argument that we should not apply here our normal "strong proof" test.He argues that, since petitioner was not represented by counsel in the early stages of the termination negotiations, Bell overreached in its demands. We do not agree. Petitioner was familiar with legal documents, had reviewed them in the past, and certainly knew their significance. Furthermore, he had access to Bonanza's counsel, Mr. DeKlotz, and could have obtained outside counsel at an earlier point if he had wished. Therefore, we can discern no acts of overreaching by Bell and if there were, we fail to understand how it could help petitioner's position. Petitioner also contends that petitioner's signing the termination agreement was due solely to duress arising from his compelling need for funds during December 1970 and January 1971. However, this type of circumstance, completely separate from the dealings between the parties, does not constitute legal duress. Cal. Civil *133 Code sec. 1569 (West 1954); Standard Box Co. v. Mutual Biscuit Co.,10 Cal. App. 746, 758-762, 103 P. 938, 943 (3rd Dist. Ct. App. 1909); see Wells Fargo Nevada Nat. Bank v. Barnette,298 F. 689 (9th Cir. 1924), affd. 270 U.S. 438 (1926). We therefore need not and do not decide whether the existence of legal duress would change our normal "strong proof" test for allocations at variance with those contained in a written agreement. Petitioner finally claims that he signed the agreement under a mistaken understanding of its terms. He asserts that he was unaware of the contents of the final agreement because he signed it without having read it. However, we have found as a fact that petitioner was aware of many of the earlier drafts. Furthermore, even if it were true that petitioner was unaware of portions of the final agreement, his failure to take reasonable steps to become aware of the contents of the agreement, particularly given his business background, his awareness of earlier drafts, and his access to counsel, precludes a finding of unilateral mistake of fact. See Union Bank v. Ross,54 Cal. App. 3d 290, 295-296, 126 Cal. Rptr. 646, 649-650 (2nd Dist. Ct. App. 1976); *134 Wal-Noon Corp. v. Hill,45 Cal. App. 3d 605, 615, 119 Cal. Rptr. 646, 652 (3rd Dist. Ct. App. 1975); Bauer v. Jackson,15 Cal. App. 3d 358, 374, 93 Cal. Rptr. 43, 50 (4th Dist Ct. App. 1971); Larsen v. Johannes,7 Cal. App. 3d 491, 501, 86 Cal. Rptr. 744, 749 (1st Dist. Ct. App. 1970). Respondent's arguments (1) that we should apply the test set out in Commissioner v. Danielson,378 F. 2d 771 (3rd Cir. 1967), cert. denied 389 U.S. 858 (1967), revg. 44 T.C. 549 (1965) (that a "party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc."), and (2) that this Court committed error in admitting parol evidence introduced to vary the specific allocation contained in the termination agreement, are moot in view of our holding for respondent on the grounds described above, and we need not reach them. Decision will be entered for *135 respondent.
Footnotes
1. The total amount which Bell paid petitioner pursuant to the termination agreement was $25,461. Petitioner and Bell agree that $1,390.02 of that amount constitutes payment by Bell to petitioner for accrued salary and unreimbursed travel expenses. Thus the dollar amount relevant to the question before us is $24,025.98, which, for convenience, we will refer to as $24,026.↩