CASSIUS C. LOWERS, JR. AND MARY J. LOWERS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lowers v. Commissioner
Docket No. 1694-90
United States Tax Court
T.C. Memo 1991-75; 1991 Tax Ct. Memo LEXIS 90; 61 T.C.M. (CCH) 1971; T.C.M. (RIA) 91075; February 27, 1991, Filed *90 Decision will be entered for the respondent. Wylie Joseph Neal, for the petitioners. C. Glenn McLoughlin, for the respondent. COUVILLION, Special Trial Judge. COUVILLION
MEMORANDUM OPINION This case was heard pursuant to section 7443A(b)(3) [1] and Rule 180 et seq. Respondent determined deficiencies of $ 4,981 and $ 2,936 in Federal income taxes, respectively, for petitioners' 1985 and 1986 tax years. The only issue for decision is whether certain payments received by Cassius C. Lowers, Jr. (petitioner) during 1985 and 1986 constituted capital gains within the meaning of section 1221. Petitioners have not challenged the other adjustments in the notice of deficiency. The parties stipulated to some of the facts, and these facts, with the annexed exhibits, are so found and incorporated *91 herein by reference. At the time the petition was filed, petitioners were residents of Tulsa, Oklahoma. Petitioner initially was an agent for Farmers Insurance Company, Inc., and several of its related companies (hereafter referred to as the "insurance company" or the "company"). The company wrote home and commercial casualty and life insurance. In 1980, petitioner was invited by the company to become a district manager. After considering three districts, petitioner selected District 08-60 at Tulsa, Oklahoma. The district consisted of a certain geographical area which was not indicated at trial; however, it presumably included all or parts of the State of Oklahoma. Petitioner's position as district manager was evidenced by a written contract or agreement executed in December 1980. According to the terms of the agreement, petitioner was required to recruit for appointment and train as many agents as was necessary to produce insurance sales in accordance with the goals and objectives of the company; to maintain required records of his operations; and to service the policyholders of the company, including their claims. The agreement prohibited petitioner as district manager *92 from representing any other insurance company. Although not set out in the agreement, petitioner testified that he was not allowed to sell insurance himself. All expenses in connection with the district office, including costs of maintaining the office and recruiting and training agents, were petitioner's responsibility. For his services, the agreement provided that petitioner would be paid a percentage or "overwrite" of all business produced by his agents "in accordance with schedules and rules adopted from time to time by the respective companies." The agreement also provided for termination, cancellation, or transfer of the contract to a successor district manager. In such situations, the option rested with the company to either pay a "contract value" to the district manager, in which event the agreement was terminated or canceled, or the company could allow a transfer of the agreement or contract to an acceptable "nominee" proposed by the outgoing manager. If an agreement was canceled or terminated, the company was obligated to pay the district manager a "contract value," the amount of which was determined by a formula set out in the agreement based upon the district manager's *93 commissions for the six months preceding the termination multiplied by a number based upon the manager's years of service. The longer a district manager served, the more he would be paid. If the company elected not to cancel or terminate the agreement in this manner, but instead allowed a transfer to an acceptable nominee, the outgoing district manager was allowed to negotiate with the nominee for compensation in an amount which could not exceed the contract value set out in the agreement. Upon cancellation, termination, or transfer, the outgoing district manager was no longer entitled to receive commissions or "overwrites." In addition, the outgoing manager could not compete against the company within the district for three years. The agreement provided that all records maintained by the district manager, including expiration lists, were the property of the company to be surrendered upon termination or cancellation of the agreement. [2]
*94 Petitioner and the company mutually agreed to a cancellation or termination of the agreement on May 1, 1985. It was agreed that petitioner's contract value was $ 42,375.65. The company paid petitioner $ 21,125 during 1985 and $ 21,251 during 1986 in discharge of its obligation. Following termination of the agreement, petitioner was appointed an agent for the company. On their 1985 and 1986 income tax returns, petitioners reported the $ 21,125 and $ 21,251 payments on Schedule D of their returns as long term capital gains. Respondent determined that these payments were not capital gains but instead were ordinary income. Section 1221 provides: For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include -- (1) stock in trade of the taxpayer * * * ; (2) property, used in his trade or business, of a character * * * subject to * * * depreciation * * * ; (3) a copyright * * * ; (4) accounts or notes receivable acquired in the ordinary course of * * * business * * * ; (5) a publication of the United States Government * * * ; Section 1222(3) provides: "The term 'long-term *95 capital gain' means gain from the sale or exchange of a capital asset." (Emphasis added.) In United States v. Eidson, 310 F.2d 111, 113-114 (5th Cir. 1962), a case involving facts very similar to this case, the Court stated: As we approach a consideration of the basic questions in this case, it is helpful to remember what has many times been made clear by the Supreme Court -- it is not every transfer for a consideration of property that gives rise to a capital gain. In Commissioner of Internal Revenue v. Gillette Motor Co., 364 U.S. 130, 4 L. Ed. 2d 1617, 80 S. Ct. 1497, the Court said at page 134, 364 U.S. 130, 80 S. Ct. 1497 at page 1500, 4 L. Ed. 2d 1617: "While a capital asset is defined in section 117(a)(1) [of the Internal Revenue Code of 1939, the precursor of Section 1221] as 'property held by the taxpayer,' it is evident that not everything which can be called property in the ordinary sense and which is outside the statutory exclusions qualifies as a capital asset. This Court has long held that the term 'capital asset' is to be construed narrowly * * *." The Court held in Eidson that amounts received by the taxpayers for the transfer of their *96 rights in an insurance management contract represented the present value of income which the recipients would otherwise obtain in the future, quoting Commissioner v. P.G. Lake, Inc., 356 U.S. 260, 266, 2 L. Ed. 2d 743, 78 S. Ct. 691 (1958): "In short, consideration was paid for the right to receive future income, not for an increase in the value of the income-producing property." The payments at issue were held to be ordinary income and not capital gain. In Vaaler v. United States, 454 F.2d 1120 (8th Cir. 1972), a case involving the cancellation of a general insurance agency contract, the Court held that payments to the agent for termination of the contract were ordinary income. The Court pointed out, at page 1122, "it has long been settled that a taxpayer does not bring himself within the capital gains provision merely by fulfilling the simple syllogism that a contract normally constitutes 'property,' that he held a contract, and that his contract does not fall within a specified exclusion." The Court found that no "property" was sold or exchanged by the agent, concluding, at page 1123: As we view it, what [the agent] relinquished in return for the $ 13,861.20 was the *97 right to render personal services as general agent of [the insurance company] and to earn a five percent override on all policies sold in the territory. His right under the contract to future commissions (earnings) thereby came to an end. Such commissions had they been earned would have constituted ordinary income. Thus, we hold that the lump sum paid for the extinguishment of the right to render such services and to earn such commissions constituted ordinary income. In Brown v. Commissioner, 40 T.C. 861 (1963), the taxpayer was "director of agencies" for an insurance company in which he recruited agents for the company and received percentages of the first-year and renewal premiums paid by the policyholders. The taxpayer assigned his contract for a cash consideration of $ 43,564.15. This Court, stating that the facts before it were substantially like the facts in United States v. Eidson, supra, held that the payments received by the taxpayer were ordinary income. In Hodges v. Commissioner, 50 T.C. 428 (1968), where the taxpayer sold an insurance agency, this Court held that the portion of the consideration for commissions *98 from renewal premiums constituted ordinary income. Finally, in Elliott v. United States, 431 F.2d 1149 (10th Cir. 1970), the Court held that payments to a general insurance agent for cancellation of an agency contract constituted ordinary income. In that case, after the cancellation, the taxpayer retained the right to collect commissions on premiums with respect to insurance policies written during the time the taxpayer had been the agent. In this case, petitioners point to this difference. The Court sees no significance to that difference because the character of the future commissions to be received by the agent in Elliott was not at issue and, even if the future commissions had been at issue, there appears little doubt that such payments would have been ordinary income, since compensation for services rendered is taxable in the year in which the compensation is received. Sivley v. Commissioner, 75 F.2d 916 (9th Cir. 1935), affg. a Memorandum Opinion of this Court. Since payments received by the taxpayer in Elliott in succeeding years related precisely to the character of the payments received at the time the contract was terminated, *99 it is evident that future commissions would likewise have been ordinary income. The factual difference, therefore, between Elliott and this case is immaterial. The basic and fundamental fact in this case, as well as in all other cases cited, is that petitioners gave up a right to future income, and the courts have consistently held that payments received in consideration for future income constitute ordinary income. Petitioners argued, citing Rev. Rul. 65-180, 1965-2 C.B. 279, and cases cited therein, that they had a basis in their manager's contract evidenced by the expenses petitioners incurred over the years in operating the office and in the recruitment and training of agents, all of which petitioners were required to bear. Additionally, the expiration lists and other records of petitioner's office which were surrendered to the insurance company constituted goodwill. Ostensibly, the argument purports to establish that the expenses incurred over the years established a basis in petitioner's contract, thus giving credence to their contention that they owned "property" within the meaning of section 1221, and that in canceling the contract there *100 was a "sale or exchange" for purposes of section 1222 by virtue of the records' being surrendered to the company. Additionally, that portion of the contract which constituted goodwill would, without doubt, be characterized as a capital gain asset. Petitioners' argument is not persuasive. To begin with, the records petitioners compiled and surrendered, while very valuable, were not petitioners' records. The manager's agreement expressly provided that all records of the district manager were the exclusive property of the company. Secondly, although petitioners incurred expenses over the years as district manager, there was no evidence presented to establish that these expenses were capitalized and not deducted on their income tax returns for each of the years in which petitioner was district manager. Petitioners, therefore, had no basis. This argument was made in Elliott, and the Court found the taxpayer had no basis because all prior years' expenses had been claimed as deductions on the taxpayer's tax returns. Finally, the Court notes that, since petitioner was obligated upon cancellation of the contract not to compete against the company for three years, to the extent *101 that any portion of the payments represented payments for a covenant not to compete, such payments constitute ordinary income. Major v. Commissioner, 76 T.C. 239, 245 (1981). Respondent, therefore, is sustained in the determination that the payments at issue constituted ordinary income. Decision will be entered for the respondent.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. In Blaine v. United States, 441 F.2d 917, 919↩ n.1 (5th Cir. 1971), the Fifth Circuit noted that the District Court in its instruction to the jury defined insurance expirations as "records of an insurance agency by which the agent has available a copy of the policy issued to the insured or records containing the date of the insurance policy, the name of the insured, the date of its expiration, the amount of insurance, premiums, property covered, and terms of insurance. This information enables the agent to contact the insured before the existing contract expires and arms him with the information essential to secure another policy and to present to the insured a solution for his insurance requirements. This expiration list is an asset that is characterized as intangible personal property."